In re ELSINORE SHORE ASSOCIATES, d/b/a The Atlantis Casino Hotel, Elsinore of Atlantic City, Elsinore of New Jersey, Inc., Elsub Corporation, and Elsinore Finance Corporation, Debtors.

Bankruptcy No. 85–06058.

United States Bankruptcy Court, D. New Jersey.

March 24, 1988.

lot utility" and "lacking [a] second full bath," sold for $200,000.

Crummy, Del Deo, Dolan, Griffinger & Vecchione by Michael R. Griffinger, Karen A. Giannelli, David M. Hyman, Newark, N.J., Weill, Gotshal & Manges by Marvin E. Jacob, Jay M. Goffman, New York City, for debtors.

Mairone, Biel, Gould, Zlotnick, Feinberg & Griffith by Alan I. Gould, Eric A. Browndorf, Atlantic City, N.J., for Unsecured Creditors' Committee.

McCarter & English by Amelia H. Boss, Cherry Hill, N.J., for Playboy Enterprises, Inc.

Fried, Frank, Harris, Shriver & Jacobson by Brad E. Scheler, New York City, for the Unofficial Committee of Senior Bondholders.

Lashner, Victor & Maschmeyer by Melvin Lashner, William Lashner, Philadelphia, Pa., Meranze & Katz by Michael N. Katz, Cherry Hill, N.J., for H.E.R.E. Intern. Pension Plan, H.E.R.E. Welfare Fund, H.E.R.E. Local 54 Severance Fund ("Funds").

Leonard J. DiGiacomo, Asst. Counsel, State of N.J., Casino Control Com'n, John E. Adams, Jr., Robert Latimer, Deputies Atty. Gen., State of N.J., Div. of Gaming

Enforcement, United States Attorneys Office by Paul A. Blaine, Asst. Atty. for the I.R.S., Ober, Kaler, Grimes & Shriver by George J. Koelzer, Edison, N.J., for Maryland Nat. Leasing Services Corp.

Riker, Danzig, Scherer, Hyland & Perretti by Karen B. Bezner, Gabriel Del Virginia, Morristown, N.J., for Casino Reinvestment Development Authority.

## OPINION

ROSEMARY GAMBARDELLA,
Bankruptcy Judge.

Before the Court is the Debtors' Third Amended Joint Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code ("the Plan") dated December 7, 1987 submitted by Elsinore Shore Associates, d/b/a The Atlantis Casino Hotel ("ESA"), Elsinore of Atlantic City ("EAC"), Elsinore of New Jersey, Inc. ("ENJ"), Elsub Corporation ("Elsub"), and Elsinore Finance Corporation ("EFC"), all debtors herein (collectively referred to as "Debtors"), together with Elsinore Corporation, Hyatt Tahoe, Inc., and Four Queens, Inc. (collectively referred to as the "Proponents").

Objections to confirmation of the plan have been filed by H.E.R.E. International Pension Plan, H.E.R.E. Welfare Fund and H.E.R.E. Local 54 Severance Fund ("the Funds"), the Internal Revenue Service ("IRS"), and Stein's Food Service Equipment, Inc. ("Stein's Food Service"). Hearings on confirmation of the plan were conducted on February 8, 9 and 18, 1988. The following constitutes this court's findings of fact and conclusions of law.

On November 14, 1985 ESA filed a voluntary petition under Chapter 11 of the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("Bankruptcy Code"). On July 24, 1987, EFC, ENJ, EAC and Elsub filed voluntary petitions for reorganization under Chapter 11. On July 24, 1987, this court entered an order consolidating the debtor proceedings for administrative purposes. ESA is in the business of operating the Atlantis Casino Hotel on the Boardwalk in Atlantic City, New Jersey.

Stein's Food Service filed an Objection to Confirmation of Plan of Reorganization on the basis that Stein's Food Service holds two claims against the debtors: an administrative priority claim in the amount of $3,994.88 and an unsecured claim in the amount of $6,936.44. Stein's Food Service asserts that the plan recognizes the unsecured claim but makes no provision for payment of the administrative claim.

Counsel for the debtors at the February 8, 1988 confirmation hearing stated that the debtors recognized a valid reclamation claim of Stein's Food Service to the extent previously ordered by the court, which will be paid as an administrative expense under the plan. (*See* Tr. of 2/8/88 at 40). This court finds that Stein's Food Service's claim is adequately treated under the plan.

The IRS objects to payment of its unsecured priority claims on any basis other than with statutory interest as provided by 26 U.S.C. §§ 6621 and 6622. The IRS takes the position that the present value of the taxes owed by the debtors and to be paid in deferred payments pursuant to 11 U.S.C. § 1129(a)(9)(C) includes the statutory interest rate set by the Secretary under §§ 6621 and 6622 of the Internal Revenue Code.

The United States of America, Internal Revenue Service, on January 22, 1988 filed an "Objection to Confirmation of the Amended Plan of Reorganization." By its objection the IRS asserts that it has the following claims: (1) administrative claims in the amount of $8,893.29; (2) unsecured priority claims in the sum of $485,360.17, and (3) unsecured general claims of $2,149.51. The IRS asserts that the plan only provides for payment of interest on its priority claims at the rate specified in 26 U.S.C. §§ 6621 and 6622 as an alternative method of payment. (*See* Art. 4 of Plan).

Counsel for the debtors and the IRS at the February 8, 1988 confirmation hearing agreed to preserve the issue of the calculation of the present value of the IRS' claim, pending a determination of confirmation of the plan. (*See* Tr. of 2/8/88 at 37–39).

The Funds filed objections to confirmation of the plan as follows:

(1) The Plan reflects the non-confirmability of said Plan since the Plan requires participating creditors to waive claims against non-debtor, third parties and the consummation of said Plan discharges non-debtor, third parties. The Funds assert that such release and discharge of non-debtor, third parties violates Section 524(e) of the Bankruptcy Code.

(2) The Plan provides for a release to be signed by counsel for the Unsecured Creditors' Committee on behalf of all unsecured creditors. The Funds assert that this provision is illegal and invalid and cannot be part of a confirmable plan.

(3) The Plan should not be confirmed since the acceptances thereto were obtained by a false and misleading Disclosure Statement, the approval of which is on appeal. The Funds assert that no order of confirmation should be entered until that appeal is decided.

(4) The Plan should not be confirmed in that it is not fair and equitable in that said Plan is a constructive fraud on unsecured creditors since the Debtors propose paying off guaranteed debts of their parent, Elsinore, in full, before unsecured creditors are paid.

(5) The Bankruptcy Court has scheduled a hearing on confirmation of the Plan without deciding various litigation that has been filed with this Court and has not been heard by the Court or if heard, has not been decided by the Court, including but not limited to:

(a) a motion filed by the Funds for the appointment of a trustee, and

(b) a motion by ESA for rescission of a certain real estate transaction which has been full tried and briefed.

(6) Until the issues brought before this Court on marshalling and equitable subordination of Elsinore's unconditional guarantee of certain bonds of the debtor are decided by the Bankruptcy Court, no confirmation hearing should be held.

(7) The Plan should not be confirmed in that it is not fair and equitable in that the Plan is a constructive fraud on unsecured creditors since the debtors propose paying off the guaranteed debts of their parent corporation which would eventually insure that the parent corporation is relieved of responsibility for all of its debts while the unsecured creditors are being paid only a small portion of their debt under the Plan.

(8) The Plan violates the absolute priority of payment rule in that the unsecured creditors have not been paid in full and other creditors who are lower in priority than the unsecured creditors are being paid various sums of money including but not limited to the debts of the parent corporation of the debtors, Elsinore, and debtor's ex-partner, Playboy Enterprises, Inc.

The Funds originally sought to argue that the plan violates the absolute priority rule and is not fair and equitable. The absolute priority rule and the fair and equitable standard come into play under the cram-down provisions of § 1129(b). The general principal of the subsection requires that a plan must provide either that an impaired non-accepting class of creditors be paid in full with respect to their claims, or that no interest junior to that class of creditors receive any distribution under the Plan with respect to the junior claimant's claim or interest. *See In re Toy & Sports Warehouse, Inc.,* 37 B.R. 141, 152 (Bankr.S.D.N. Y.1984).

At the February 18, 1986 confirmation hearing Melvin Lashner, Esquire, counsel for the Funds stated:

> We've included our fair and equitable into the principle, the concept of not made in good faith, and the absolute priority is not applicable.

(*See* Tr. of 2/18/86 at 247).

The plan before the court contains twelve classes of claims and interests, with varying payment provisions as follows:

*Class 1* consists of priority non-tax claims. These claims are to be paid in cash on the Effective Date or upon such terms as may be agreed to by the holder of any such claim.

*Class 2A* consists of secured claims arising under the Senior Mortgage Bonds and

Indenture. These claims arise as a result of a certain indenture, dated as of November 1, 1984 among EFC, Elsinore, as guarantor, and Manufacturers Hanover Trust Company, as Indenture Trustee, pursuant to which 15½% Senior Mortgage Bonds, in the original principal amount of $115,000,000.00 due 1999, were issued by EFC.

The Senior Mortgage Bonds are secured primarily by a $90 million promissory note of ESA (the "ESA note") and a mortgage on the Atlantis Casino Hotel (the "ESA mortgage"), which is owned by ESA, and a $25 million promissory note of Hyatt Tahoe and a mortgage on the Hyatt Lake Tahoe. Both the notes and mortgages have been assigned to the Indenture Trustee for the benefit of the holders of Senior Mortgage Bonds.

Under the plan, on or prior to the Effective Date, Elsinore shall deposit with the Indenture Trustee by wire transfer an amount sufficient to pay or reimburse the Indenture Trustee for its costs and expenses. Elsinore shall also pay or cause to be paid to the New Indenture Trustee, United States Trust Company of New York, Trustee under the New Indenture, for payment ratably to the holders of Allowed Class 2A Claims, the sum of $45,000,000.00 for application to the principal of the Senior Mortgage Bonds. Interest that has accrued on the bonds prior to the Effective Date shall be satisfied either by cash payments by Elsinore, or EFC pursuant to New Indenture Coupons or by Elsinore Common Stock.

On the Effective Date, pursuant to the New Indenture, EFC will execute and cause the New Indenture Trustee to authenticate and deliver new Senior Mortgage Bonds, with attached Coupons, to holders of Class 2A claims. Elsinore, on the Effective Date shall execute and deliver to the New Indenture Trustee a New Elsinore Guarantee. Obligations under the New Elsinore Guarantee shall be payable only in Elsinore Common Stock in accordance with a Common Stock Formula.

No holder of a Senior Mortgage Bond shall be entitled to any payment or distribution under the plan unless and until it shall have surrendered its Senior Mortgage Bond to the New Indenture Trustee, except that payments and distributions may be made without such surrender upon presentation to EFC and the New Indenture Trustee of evidence sufficient under 2.07 of the Indenture, together with the indemnity contemplated therein, to warrant issuance of a replacement security.

Under the plan, on the Effective Date, ESA will reimburse EFC and EFC will reimburse Elsinore for its payments of interest accrued from and after January 1, 1987 on the Senior Mortgage Bonds to the extent secured under the ESA Note and ESA Mortgage, provided that such reimbursement does not reduce ESA's cash and cash equivalents below $10,000,000.00 as of the Effective Date. Interest accrued on the Senior Mortgage Bonds prior to January 1, 1987, and paid or satisfied by Elsinore on or prior to the Effective Date and any interest not reimbursed in cash shall constitute part of the Elsinore Subrogation Claim and shall be included in the principal amount of a promissory note to be issued by EFC to Elsinore ("Elsinore Note").

The Elsinore Suborgation Claims consist of any payments made by Elsinore under the terms of the Georgia Avenue Mortgages after October 1, 1985 and on or prior to the Effective Date, plus the subrogation claims arising from the making of payments of principal and interest by or on behalf of Elsinore to the Indenture Trustee for the benefit of Class 2A claims on or prior to the Effective Date, excluding any payments made on account of indebtedness of Hyatt Tahoe. The Elsinore subrogations claims shall be evidenced by the Elsinore Note.

*Class 2B* consists of secured claims arising under a certain promissory note dated as of November 1, 1984 from ESA to EFC in the original principal amount of $90,000,000.00, which was assigned to the Indenture Trustee to secure EFC's obligations under the Indenture and an indenture of mortgage, assignment of leases and rents, security agreement and related instruments, each dated as of November 1, 1984 between ESA and EFC, encumbering the

Atlantis Casino Hotel in Atlantic City, New Jersey and related properties, which were assigned to the Indenture Trustee to secure EFC's obligations under the Indenture. On the Effective Date ESA will deliver to EFC, in substitution and exchange for Allowed 2B Claims, a promissory note in the amount of $70,000,000 together with and including the coupon annexed thereto providing for payments in an amount equal to the aggregate amount of all payment to be made under the Coupons to be issued by ESA and delivered to EFC on the Effective Date, or any renewal, extension, refinancing or replacement thereof ("New Atlantis Note"); and a promissory note to be issued by ESA to EFC having a principal amount equal to that of the Elsinore Note ("EFC Note").

ESA shall also pay to EFC an amount, in cash, equal to the reimbursement paid by EFC to Elsinore for Elsinore's payment of accrued interest in the Senior Mortgage Bonds accrued from and after January 1987. ESA shall also execute and deliver to EFC a New Senior Mortgage and other Security Documents, which in turn shall assign same to the New Indenture Trustee and Elsinore as collateral security for obligations under the New Indenture and the Elsinore Note. The security interests related to the additional collateral shall be subordinate to liens and security interests granted to secure payments of up to $5,000,000.00 in principal amount of ESA's obligations outstanding at any time, up to an aggregate of $10,000,000.00 in principal, to persons making loans to ESA for working capital. ("Working Capital Loan").

*Class 3* consists of secured claims of lessors arising under lease agreements. These claimants shall have defaults under the lease agreements cured and the lease agreements shall be reinstated. The liens and security interests of these creditors in property of the Debtors shall be retained subsequent to confirmation.

*Class 4* consists of secured claims arising under mortgages on property located at Georgia Avenue, Atlantic City, New Jersey. These mortgages consists of a certain mortgage, dated February 1, 1979, securing a note in the original principal amount of $497,000.00 executed by F & M Properties and delivered to Frank L. and Lydia E. Kearns, which was assumed by Playboy–Elsinore Associates, now known as ESA, on or about September 28, 1982 and a mortgage dated September 28, 1983, securing a note in the original principal amount of $7,048,100.00, executed on behalf of Playboy–Elsinore Associates, now known as ESA, and delivered to Fabi Concrete Corp., Jeddo Corp., F & M Properties, Frank Abramoff and the Hebrew Old Age Center of Atlantic City, which mortgage was subsequently assigned to Midlantic National Bank/South on or about July 19, 1984.

Under the plan these mortgages shall be reinstated subject to certain modifications in the maturity dates of the notes and the payment of interest. Under the plan ESA's motion, dated January 21, 1986, seeking in part, rescission of a certain contract of sale dated October 11, 1985 of the properties known as Georgia and Bellevue Avenue from ESA to Elsinore shall be deemed granted upon confirmation and any and all claims asserted or assertable against the proponents which arose under or in connection with the sale or closing and consummation thereof shall be released effective as of the Effective Date. Under the plan Class 4 claimants shall retain their liens against the property. Any secured claim in favor of Elsinore arising as a result of the granting of the rescission motion shall be deemed a Class 7 claim, which claim will be a contribution to capital and which claimholders shall not receive or retain any property of value on account of their claims.

*Class 5A* consists of non-priority unsecured claims. Under the plan the Class 5A claimants shall receive on the Effective Date or "as soon as practicable thereafter" an amount in cash equal to its ratable share of the sum of $1,000,000.00, if such allowed claims do not exceed $9,500,000.00. If the claims exceed that amount, the amount of cash distributed shall be increased by 10% of such excess, but in no event by more than an additional $100,000.00.

ESA shall also execute a non-recourse promissory note in the principal amount of $1,000,000.00 for the ratable benefit of 5A claimants ("Trade Note"). The Trade Note is subordinate and junior in payment to any obligations arising under the New Atlantis. Note and Working Capital Loan, on a parity in right to payment with the New Playboy Priority Note and Fidelity Priority Note, and senior and prior to the Fidelity Parity Note, the New Playboy Parity Note and the EFC Note.

*Class 5B* claims consists of the non-priority, unsecured claims of First Fidelity Bank, N.A., New Jersey ("First Fidelity"). Under the plan, on the Effective Date ESA shall execute and deliver to First Fidelity a non-recourse promissory note in the amount of $2,150,000.00 ("Fidelity Priority Note").

On the Effective Date ESA shall also execute and deliver to First Fidelity a non-recourse promissory note in the amount of $2,100,000.00 ("Fidelity Parity Note").

The Fidelity Priority Note shall be subordinate and junior in right of payment to any and all obligations arising under the New Atlantis Note and the Working Capital Loan, on a parity in right to payment with Trade Note and New Playboy Priority Note and senior and prior in right to payment to the Fidelity Parity Note, the New Playboy Parity Note and the EFC Note.

The Fidelity Parity Note shall be subordinate and junior in right of payment to any obligation arising under the New Atlantis Note and the Working Capital Loan, the Trade Note, the Fidelity Priority Note and the New Playboy Priority Note, and on a parity in right of payment with the EFC Note and the New Playboy Parity Note.

In the event of a sale of the Atlantis Casino Hotel, First Fidelity, Playboy and EFC shall share in the proceeds of sale otherwise distributable to EFC on the basis of $.80 of each dollar of such proceeds is paid to EFC, $.10 of each dollar to Playboy, $.10 of each dollar to First Fidelity until satisfaction of ESA's obligation to Playboy. Thereafter $.90 of each dollar is paid to EFC, $.10 each dollar to First Fidelity until

satisfaction of ESA's obligation to First Fidelity or EFC.

*Class 6* consists of the claims of Playboy Enterprises, Inc. and its subsidiaries ("Playboy"). Under the plan Playboy shall receive on the Effective Date in exchange for their Allowed Class 6 Claims arising from ESA's promise to pay management fees: (a) the sum of $442,000.00 plus interest earned thereon that has been deposited in the registry of the Bankruptcy Court and is the subject of an adversary proceeding entitled *Elsinore Shore Associates v. Saiber, Schlesinger, Satz & Goldstein, and Playboy Enterprises, Inc.* (Adversary No. 86-0069) ("Playboy Escrow"); (b) a non-recourse promissory note in the amount of $750,000.00 executed by ESA ("New Playboy Priority Note"); and (c) a non-recourse promissory note in the amount of $750,000.00 executed by ESA ("New Playboy Parity Note"). In exchange for Allowed Class 6 claims consisting of the balance of management fees, and a certain promissory note, dated April 3, 1984 from Elsub to Playboy in the original principal amount of $45,384,000.00, Playboy shall receive common stock of Elsub to be issued in accordance with the plan ("New Elsub Common Stock") which when added to other shares of Elsub Common Stock issued and outstanding on the Effective Date constitute 15% of the shares of Elsub.

The plan further provides that except as permitted by the gaming authorities of the State of New Jersey, a disinterested trustee, not affiliated with Playboy, who is approved by the Bankruptcy Court shall hold the New Playboy Priority Note, the New Playboy Parity Note and the New Elsub Common Stock distributed under the plan and shall exercise voting rights attendant to the New Elsub Common Stock.

*Class 7* consists of non-priority unsecured claims of insiders of the Debtors, other than Administration Expenses, Elsinore Subrogation Claims and Class 2B Claims. The holders of Allowed Class 7 Claims shall contribute such claims to capital and shall not receive or retain any property of value on account of such claims.

*Class 8* consists of non-priority unsecured claims against Elsub arising under an indenture, dated as of January 15, 1980 by and among Elsinore, and First Fidelity, as successor trustee, and Elsub, Four Queens, and Hyatt Tahoe, as guarantors, as in effect on the date hereof, which provided for the issuance by Elsinore of $25,000,000.00 principal amount of Subordinated Debentures ("Elsinore Subordinated Indenture"), and certain 14% subordinated debentures, due 1997, issued by Elsinore pursuant to the Elsinore Subordinated Indenture and guaranteed by, *inter alios* Elsub ("Subordinated Debentures").

Under the plan, on or before the Effective Date, the trustee for holders of Allowed Class 8 claims shall be paid an amount equal to the principal of and accrued interest of the Subordinated Debentures, without premium or penalty.

On the Effective Date or such other date as may be agreed, Elsinore shall deposit with the successor trustee for Elsinore Subordinated Indenture an amount sufficient to pay (or reimburse the successor trustee for its payment of) reasonable costs and expenses incurred by such successor trustee that are payable under the Elsinore Subordinated Indenture. No holder of a Subordinated Debenture shall be entitled to any payment or distribution under the plan unless and until it shall have surrendered its Subordinated Debenture to the successor trustee therefore, except that payments and distributions may be made without such surrender upon presentation to Elsinore and such successor trustee of evidence sufficient under § 306 of the Elsinore Subordinated Indenture together with the indemnity requirement therein, to warrant issuance of a replacement security.

*Class 9* claims consist of all unsecured claims against Elsub and EAC, as general partners of ESA, and ENJ, as general partner of EAC, which arose solely by virtue of their status as general partners.

Holders of Class 9 claims shall receive only the distributions to which they are entitled pursuant to other provisions of the plan as holders of allowed claims against ESA and shall not receive or retain any other property of value on account of their Allowed Class 9 Claims.

*Class 10* consists of all Equity Interests in the Debtors. Equity Interests shall be preserved, subject to such dilution as may occur as a result of distribution of new equity interests under the plan.

In consideration for contribution of Elsinore's Administration Expenses in the Chapter 11 case of ESA and Allowed Class 7 Claims of Elsinore and contribution of same to Elsub, the contribution by Elsub of 54.3% of such claims and expenses to ENJ, and thereafter by ENJ to EAC and EAC to ESA and the contribution of 45.7% of such Claims and Expenses, as well as its Allowed Class 7 Claims, directly by Elsub to ESA, and like contributions by ENJ to EAC and EAC to ESA of their Allowed Class 7 Claims, as well as other good and valuable consideration set forth in the plan, on the Effective Date, all Equity Interests shall be preserved, subject, however, to dilution as set forth in the plan.

At the hearing on confirmation, counsel for the debtors filed a "Certification of Voting Procedures" which indicated that of the ten (10) impaired classes of creditors (Class 2A, 2B, 4, 5A, 5B, 6, 7, 8, 9, 10) Class 2A creditors (Secured Claims Under Senior Mortgage Bonds) voted 24 claims aggregating $100,527,000.00 to accept the plan as against 3 creditors holding claims aggregating $20,000.00 voting to reject the plan. The sole Class 2B creditor (Secured Claims Under ESA Note and Mortgage), EFC, voted its claim in the amount of $115,000,000.00 to accept the plan. Class 4 creditors (Claims Under Georgia Avenue Mortgage) voted 1 claim in the amount of .$6,070,000.00 to accept the plan. This was the only claim voted in that class. Class 5A creditors (General Unsecured Creditors) voted 321 claims aggregating $5,762,900.58 (or 88.2% of the total claims voted), as against 33 claims aggregating $773,969.84 rejecting the plan. The sole Class 5B creditor (First Fidelity), First Fidelity voted its claim of $5,522,696.92 to accept the plan. The sole Class 6 creditor (Playboy), Playboy, voted its claim of $46,189,993.00 as a conditional acceptance of the plan. Coun-

sel for Playboy at the February 9, 1988 confirmation hearing stated that Playboy withdrew any condition to its acceptance of the plan, and that its acceptance was unconditional (*See* Tr. of 2/9/88 at 34). Class 7 creditors (General Unsecured Claims of Insiders) voted 6 claims aggregating $155,374,046.00 to accept the plan. No other ballots were cast. Class 8 creditors (Unsecured Claims Against Elsub as Guarantor of the Subordinated Debentures) voted 30 claims aggregating $10,828,000.00 to accept the plan as against 1 creditor holding a claim in the amount of $5,000.00 voting to reject the plan. Class 9 creditors (Unsecured Claims Against Elsub, ENJ, and EAC as General Partners), voted 338 claims aggregating $178,610,690.20 to accept the plan, as against 33 claims aggregating $773,969.34 voting to reject the plan. Class 10 (Equity Interests) voted 2 claims to accept the plan. No other ballots were cast.

Before discussing the plan in the context of § 1129 requirements, the court must deal with the Funds' objection to confirmation of the plan based upon the proposed release and discharge provisions of the plan.

The substance of the requested releases in ESA's Third Amended Joint Plan of Reorganization provides, in pertinent part:

25.4 *Discharge.* Except as otherwise provided herein, in accordance with section 1141 of the Bankruptcy Code the rights afforded in the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims against or Equity Interests in the Debtors of any nature whatsoever ... all such Claims against or Equity Interests in the Debtors shall be satisfied, discharged and released in full ... all Creditors and holders of Equity Interests shall be precluded from asserting against the Debtors or their respective assets or properties any other or further claim based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.... In addition, on the Effective Date, in consideration for past and future services and other valuable consider-

ation, Elsinore, Hyatt Tahoe and Four Queens, and all present and former employees, officers, directors and stockholders thereof, and all employees, officers, directors, stockholders and partners of the Debtors, shall be deemed discharged and released from any and all claims.

Article 25.4 Debtors' Third Amended Joint Plan of Reorganization.

25.5 *Effect of Voting.* By voting to accept the Plan, each holder of a Claim of Equity Interest shall be deemed, as of the Effective Date, to release and discharge Elsinore, Hyatt Tahoe, Four Queens, and all present and former employees, officers, directors and stockholder thereof, and all present and former employees, officers, directors, stockholders and partners of the Debtors from any and all claims.

Article 25.5 Debtors' Third Amended Joint Plan of Reorganization.

25.6 *Retention of Distributions.* By accepting any payment or distribution under the Plan, each holder of a Claim or Equity Interest shall be deemed, as of the Effective Date, to release and discharge Elsinore, Hyatt Tahoe, Four Queens, and all present and former employees, officers directors and stockholder thereof, and all present and former employees, officers, directors, stockholders and partners of the Debtors from any and all claims.

Article 25.6 Debtors' Third Amended Joint Plan of Reorganization.

Article 24 of the Plan entitled "Conditions Precedent to Effective Date" provides:

The following shall be conditions precedent to the closing and consummation of the Plan and the transactions contemplated under the Plan:

24.3 *Releases and Discharges.* The Confirmation Order shall direct the Indenture Trustee to execute and deliver, effective as of the Effective Date, and it shall have executed and delivered to Hyatt Tahoe a release and discharge of the Hyatt Tahoe Note and Mortgage, which shall be in a recorda-

ble form, and Hyatt Tahoe shall be released from any all other obligations under the Indenture. In addition, the Confirmation Order shall direct that each of First Fidelity and Playboy shall execute and deliver mutual general releases to Elsinore on the Effective Date, and the Committee [Official Committee of Unsecured Creditors] by its counsel shall execute and deliver a general release to Elsinore on the Effective Date.

■ Section 524(e) of the Bankruptcy Code provides:

(e) Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.

When a bankruptcy court discharges a debtor, it does so by operation of the bankruptcy laws, not by contractual consent of the creditors. *Underhill v. Royal,* 769 F.2d 1426, 1432 (9th Cir.1985); *Union Carbide Corp. v. Newboles,* 686 F.2d 593, 595 (7th Cir.1982).

In *Union Carbide,* the plan of reorganization provided for the "settlement, satisfaction and discharge" against third party guarantors in exchange solely for distribution of proceeds from property of the debtor. Subsequently, a creditor sued the guarantors on the guaranty. The guarantors contended that creditors' approval of the plan of reorganization worked an accord and satisfaction under Indiana law and thereby erased their liability on the guaranty.

Relying on Section 16 of the Bankruptcy Act of 1898 which provided that "[T]he liability of a person who is co-debtor with, or guarantor or in any manner a surety for, a bankrupt shall not be altered by the discharge of such bankrupt," the court held that the statute specifically prohibited the purported discharge of the guarantors, regardless of the provision in the plan to the contrary. The court reasoned that the purpose of Section 16 was to prevent a creditor from being forced to lose his claim against a third party involuntarily and without consideration:

A bankruptcy discharge arises by operation of federal bankruptcy law, not by contractual consent of the creditors.... A creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings, simply because the gamesmanship imported by state contract law into the bankruptcy proceedings would be intolerable. Since a majority of the creditors must approve the debtor's plan for the debtor to be discharged, in many instances one creditor's approval or disapproval will have no effect even in the bankruptcy proceeding.... Similarly, the payment which effects a discharge is not consideration for any promise by the creditors, must less for one to release non-party obligors.

*Id.* at 595. *Accord at R.I.D.C. Industrial Development Fund v. Snyder,* 539 F.2d 487, 490, n. 3 (5th Cir.1976), *cert. denied* 429 U.S. 1095, 97 S.Ct. 1112, 51 L.Ed.2d 542 (1977).

In the case of *Underhill v. Royal,* 769 F.2d 1426 (9th Cir.1985), after National Mortgage Exchange of Southern California ("NMESC") filed for reorganization under Chapter 11 of the Bankruptcy Code, investor Underhill (an unsecured creditor who held an investment interest in promissory notes executed by NMESC) filed a class action alleging securities fraud on the part of Carlos Royal, the principal shareholder of NMESC.

The proposed plan of reorganization provided that NMESC would exchange the promissory notes in which Underhill and the prospective class members held an interest for property held by a third-party financial institution. NMESC was to use the property obtained in the exchange to secured a loan intended to satisfy creditors' claims. Attached to the proposed exchange transaction was a release by investors in the promissory notes of all claims against NMESC, its affiliates and insiders. *Underhill v. Royal, supra,* 769 F.2d at 1429–30.

Eighty-nine percent of the creditors approved the plan; Underhill, however, raised objections to the release provision. The bankruptcy court confirmed the plan, ex-

plicitly leaving to the district court hearing the class action a ruling on the scope and enforceability of the release provision. *Id.* at 1430. The Ninth Circuit rendered its opinion on appeal of, among other matters, the district court's ruling that the claims release was unenforceable.

Generally, discharge of the principal debtor in bankruptcy will not discharge the liabilities of co-debtors or guarantors. 11 U.S.C. § 524(e) provides: "Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." This section of the 1978 Bankruptcy Reform Act was a reenactment of Section 16 of the 1898 Act which provided that "[t]he liability of a person who is a co-debtor with, or guarantor or in any manner a surety for, a bankrupt shall not be altered by the discharge of such bankrupt." Act of July 1, 1898, ch. 541 § 16, 30 Stat. 550 (formerly codified at 11 U.S.C. § 34 (1976)).

In addition, the Bankruptcy Act of 1898, as amended, provided that a corporation's discharge in bankruptcy "shall not release its officers, the members of its board of directors or trustees or of other similar controlling bodies, or its stockholders or members, as such, from any liability under the laws of a State or of the United States." Act of June 22, 1938, ch. 575, § 4(b), 52 Stat. 845 (formerly codified at 11 U.S.C. § 22(b)(1976)). Thus, under the old Act, stockholders or directors could remain liable for substantive violations despite discharge of the corporate entity. 1A J. Moore *Collier on Bankruptcy* Para. 16.14, at 1551 (14th ed. 1978).

The above statutory provisions underscore the limitations on the bankruptcy court. When a bankruptcy court discharges the debtor, it does so by operation of the bankruptcy laws, not by consent of the creditors. *Union Carbide Corp. v. Newboles,* 686 F.2d 593, 595 (7th Cir.1982) (per curiam). *See also In re Kornbluth,* 65 F.2d 400, 401 (2d Cir. 1933). "The import of Section 16 [of the 1898 Act] is that the mechanics of administering the federal bankruptcy laws, no matter how suggestive, do not operate as a private contract to relieve co-debtors of the bankrupt of their liabilities." *Union Carbide,* 686 F.2d at 595 (citing *R.I.D.C. Industrial Development Fund v. Snyder,* 539 F.2d 487, 490 n. 3 (5th Cir.1976), *cert. denied,* 429 U.S. 1095, 97 S.Ct. 1112, 51 L.Ed.2d 542 (1977)); *Beconta, Inc. v. Schneider,* 41 B.R. 878, 879 (D.C. E.D.Mich.1984). Consequently, "the payment which effects a discharge is not consideration for any promise by the creditors, much less for one to release non-party obligors." *Union Carbide,* 686 F.2d at 595.

*Underhill v. Royal, supra,* 769 F.2d at 1432.

In the case of *In re Future Energy Corporation,* 83 B.R. 470 (S.D.Ohio 1988), Future Energy Corporation ("Future") was engaged in the business of oil and gas exploration and development. Future operated the wells under arrangements with limited partnerships or other entities involved in drilling and completion programs. By early 1986, Future had incurred large losses and owed substantial sums to its trade creditors. In late 1986 and early 1987, Krutex Energy Corporation ("Krutex") commenced negotiations with the principals of Future regarding the acquisition of 100% of the outstanding shares of Future. The deal between Future and Krutex was consummated, thereby making Future a wholly-owned subsidiary of Krutez prior to the filing for Chapter 11 relief.

In January 1987, Canyon Development Corporation ("Canyon"), a corporation which had been formed for the purpose of acquiring control of Future, purchased several claims of Future's creditors in an attempt to obtain Future's assets. At this time, Canyon was acting independently of Krutex in attempting to gain control of Future's assets.

Prior to the filing of Future's Chapter 11 petition on February 10, 1987, Krutex engaged in several transactions which were intended to facilitate the formulation of a plan of reorganization and the ultimate re-

habilitation of Future. These transactions consisted of receiving assignments of claims held against Future by creditors, and cash infusion into Future to satisfy several claims held by BancOhio. Subsequent to the filing of Future's Chapter 11 petition, Krutex continued to negotiate with various creditors of Future in an attempt to obtain assignments of their claims. It was during this time that Krutex first became aware that Canyon was also purchasing the claims of Future's creditors. Canyon planned to acquire Future's assets by obtaining the secured positions of Future's creditors and then proceeding with state court foreclosure actions. Thus, a bidding war had developed between Krutex and Canyon over the control of Future's assets.

Krutex determined that the time and expense involved in attempting to successfully reorganize Future would be increased unnecessarily if the competition between Krutex and Canyon continued. Accordingly, Krutex and Canyon commenced a series of negotiations which culminated in an August 19, 1987 sale by Krutex to Canyon of 80% of the outstanding common shares of Future. The three entities; Future, Krutex, and Canyon, jointly proposed a Chapter 11 plan of reorganization.

Two creditors of Future objected to the proposed plan on the basis that it improperly provided for the release of potential claims against third parties, i.e., Krutez and Canyon in violation of § 524(e). The release provision objected to purports to release Krutez and Canyon from all claims and causes of actions held by third parties receiving distributions under the plan. The release provision provides in relevant part as follows:

> Any creditor receiving distributions pursuant to this plan shall be conclusively presumed to have fully released Future, Krutez, Canyon and their affiliates for any debt for which such distributions are received. Such release shall be given in consideration of the funding of this plan by Krutez and Canyon and shall be enforceable against any claimant receiving distributions as a matter of contract. Acceptance of distributions pursuant to

this plan of reorganization by any holder of an allowed claim or allowed interest shall constitute, except as set forth herein, a full, complete, final and binding release of any and all claims, actions or causes of actions, now or heretofore existing, whether asserted or unasserted, as to Future, Krutez, Canyon and their affiliates.

*In re Future Energy Corporation*, 83 B.R. 470 (S.D.Ohio 1988). The bankruptcy court held that since the release provision purported to release Krutez and Canyon from liability on Future's debts, and from all other potential claims and causes of action, that aspect of the plan violated § 524(e) and, thereby, caused the plan to run afoul of § 1129(a)(1). *In re Future Energy Corporation, supra, citing, Union Carbide Corp. v. Newboles*, 686 F.2d 593, 595 (7th Cir.1982); *Underhill v. Royal*, 769 F.2d 1426, 1432 (9th Cir.1985); *In re Eller Brothers, Inc.*, 53 B.R. 10, 12 (Bkrtcy.M.D. Tenn.1985); *In re L.B.G. Properties, Inc.*, 72 B.R. 65, 66 (Bkrtcy.S.D.Fla.1987). *See also In re Sanders*, 81 B.R. 496, 499 (Bank. W.D.Ark.1987); *In re Scranes*, 67 B.R. 985, 989 (Bank.N.D.Ohio 1986); *In re Sago Palms Joint Venture*, 39 B.R. 9 (Bank.S.D. Fla.1984).

In *Stoll v. Gottlieb*, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104, *reh'g denied*, 305 U.S. 675, 59 S.Ct. 250, 83 L.Ed. 437 (1938), the United States Supreme Court was faced with an issue regarding the conclusiveness of a reorganization plan which released the guarantor from his obligation, assuming the bankruptcy court did not have jurisdiction of the subject matter of the order, the release in reorganization of a guarantor from his guarantee of the debtor's obligations. The Supreme Court stated:

> A court does not the power, by judicial fiat, to extend its jurisdiction over matters beyond the scope of the authority granted to it by its creators. There must be admitted, however, a power to interpret the language of the jurisdictional instrument and its application to an issue before the court. Where adversary parties appear, a court must have the power

to determine whether or not it has jurisdiction of the person of a litigant, or whether its geographical jurisdiction governs the place of the occurrence under consideration. Every court in rendering a judgment, passively, if not expressly, determines its jurisdiction over the parties and the subject matter. An erroneous affirmative conclusion as to the jurisdiction does not in any proper sense enlarge the jurisdiction of the court until passed upon by the court of last resort, and even then the jurisdiction becomes enlarged only from the necessity of having a judicial determination of the jurisdiction over the subject matter. When an erroneous judgment, whether from the court of first instance or from the court of final resort, is pleaded in another court or another jurisdiction the question is whether the former judgment is *res judicata.*

*Stoll v. Gottlieb, supra,* 59 S.Ct. at 137.

The Supreme Court went on to hold that the order of the bankruptcy court confirming the plan of reorganization which provided for the releases of guarantees was *res judicata* in a subsequent action to recover on the guarantees. *Stoll v. Gottlieb, supra,* 59 S.Ct. at 139–40. *Accord, Republic Supply Co. v. Shoaf,* 815 F.2d 1046 (5th Cir.1987).

■ In the case at bar, the plan provides that in consideration for past and future services and other valuable consideration, Elsinore, Hyatt Tahoe, and Four Queens, and all present and former employees, officers, directors and stockholders thereof, and all employees, officers, directors, stockholders and partners of the debtor shall be deemed discharged and released from any and all claims. (Article 25.4 of Debtors' Third Amended Plan).

The provisions of the plan also requires the Unsecured Creditors' Committee by its counsel execute and deliver a general release to Elsinore on the Effective Date. These releases are not voluntary releases given in favor of non-debtor plan funders, but are sought over the objections of dissenting creditors. Such releases have no basis in existing bankruptcy law.

In the case of *Monroe Well Service, Inc.,* 80 B.R. 324 (Bankr.E.D.Pa.1987), there were five inter-related debtors that were in the business of putting together limited partnerships for oil drilling ventures. Once the investors were obtained and the limited partnership formed, one of the debtors would undertake oil exploration, drill oil wells, and operate them. Other debtors would provide equipment, own some of the wells and act as general partners. When oil prices declined during the 1980's, the debtors were forced to seek protection under Chapter 11 of the United States Bankruptcy Code.

The debtors' financial problems had significant consequences for those financially connected to the debtor entities. Continental Bank, who was involved in financing the debtors' operations, found itself the target of a multi-million dollar lawsuit brought by a class of limited partners in the debtors' ventures. Sheldon S. Somerman, the principal of the debtor entities, had personally guaranteed corporate obligations and some creditors anxious to collect on those guarantees initiated an involuntary petition against him. Oil wells, of which the limited partnerships owned the mineral rights or their working interests, were subject to the liens of mechanics and materialmen. The mechanics and materialmen were unsecured creditors of the debtors but secured creditors of the nondebtor limited partnerships.

Continental Bank, the official committee of limited partnerships, and Somerman had joined forces in an attempt to resolve most, if not all, of their respective disputes surrounding the affairs of the debtors within the context of the Chapter 11 proceedings. They proposed a plan which, upon confirmation, was designed to put an end to various claims and litigation involving nondebtors. Each of these nondebtor entities provided funds to implement the plan. The plan itself placed all unsecured creditors into one class for voting purposes. Creditors could opt into one or more voluntary nonvoting classes in exchange for granting releases to the nondebtors. Funds provided by the nondebtors would be distributed

only to members of the optional classes. Electing unsecured creditors would receive about 7% of their claims, while non-electing creditors would only receive .4%.

Objections to the plan were raised in the context of objections to the disclosure statement submitted by the debtors and the plan proponents. Since virtually all of the structural objections were dependent upon the distributions to be made to creditors, the court deferred ruling upon these objections until the confirmation hearing. All parties to the proceedings, however, believed that the question whether a plan of reorganization can provide for voluntary releases of nondebtors could be determined by the court. The dispute surrounding this issue was deemed purely a legal issue by the parties to the proceeding, which was both capable of being addressed at hearing on disclosure and that, in the interest of economy, should be addressed. The court stated that this issue was somewhat connected with the question of claim classification which can be addressed prior to a confirmation hearing. *In re Monroe Well Service, Inc.*, 80 B.R. 324, 333 (Bkrtcy.E.D. Pa.1987); Bankruptcy Rule 3013. Thus, the bankruptcy court deemed this issue ripe for determination. *Id.*

The court in *Monroe Well* relied upon *In re AOV Industries, Inc.*, 792 F.2d 1140 (D.C.Cir.1986), which upheld, in part, an order confirming a plan of reorganization which provided for voluntary releases by creditors in favor of nondebtor plan funders. The *Monroe Well* court agreed with the objectors to the proposed plan, in that, under § 524(e) the debtors could not obtain confirmation of a plan which would attempt, over their objection, to discharge the obligations of nondebtors, such as guarantors. *In re Monroe Well Service, Inc., supra*, 80 B.R. at 334. The court further stated:

> As with the plan here, the plan in *AOV Industries* made no attempt to release any claim held by a creditor against a nondebtor over the wishes of that individual creditor. Each creditor was permitted to render an individual decision whether to provide a release to a nondebtor in return for payment provided by

a nondebtor plan funder. In *AOV Industries*, the District Court concluded that, so long as the release is purely voluntary and the will of the majority of creditors cannot force dissenting creditors to provide releases, *compare Union Carbide v. Newboles*, the nondebtor plan funders will not receive a discharge and the debtor's discharge did not, by itself, affect the rights of creditors vis-a-vis those plan funders. *In re AOV Industries, Inc.*, 31 B.R. 1005, 1010–1011 (D.D. C.1983) *aff'd in part* 792 F.2d 1140 (D.C. Cir.1986). I agree; a plan provision permitting individual creditors the option of providing a voluntary release to nondebtor plan funders does not violate 11 U.S.C. § 524(e).

*In re Monroe Well Service, Inc., supra* 80 B.R. at 334–35.

Even though both the District of Columbia Circuit in *AOV* and the bankruptcy court in *Monroe Well* would permit voluntary releases of nondebtor funders of the plan, such release provisions must also meet the requirements of § 1123(a)(4). *In re Monroe Well Service, Inc., supra*, 80 B.R. at 335. Section 1123(a)(4) provides:

> (a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—

> . . . .

> (4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.

The *Monroe Well* court noted that the Court of Appeals for the District of Columbia Circuit in *AOV* concluded that equality of treatment of members of a class as contemplated by § 1123(a)(4) is not provided by permitting each creditor of that class to opt to provide a release and receive the same pro rata distribution on its claim. *In re Monroe Well Service, Inc., supra*, 80 B.R. at 335. Rather, the Court of Appeals stated:

Even though neither the Code nor the legislative history precisely defines the standards of equal treatment, the most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage settlements to co-class members. The other side of the coin of unequal payment, however, has to be unequal consideration tendered for equal payment. It is disparate treatment when members of a common class are required to tender more valuable consideration—be it their claim against specific property of the debtor or someother cignizable chose in action—in exchange for the same percentage of recovery.

*In re AOV Industries, Inc., supra,* 792 F.2d at 1152. *See also, In re Monroe Well Service, Inc., supra,* 80 B.R. at 335.

This is not to be interpreted as requiring precise equality of treatment, but rather, some approximate measure since there is no statutory obligation upon plan proponents to quantify exactly what each class member is relinquishing by a release. *In re Monroe Well Service, Inc., supra,* 80 B.R. at 335. As the Court of Appeals stated in *AOV:*

We do not hold that all class members must be treated precisely the same in all respects. Nothing in this opinion restricts the bankruptcy court's broad discretion to approve classification and distribution plans, even though some class members may have disputed claims, or a stronger defense than others.

*In re AOV Industries, Inc., supra,* 792 F.2d at 1154. *See also, In re Monroe Well Service, Inc., supra,* 80 B.R. at 335.

Although *Monroe Well* and *AOV* purport to allow releases of non-debtors, both decisions involve releases which were voluntarily given by creditors. The district court's decision in *AOV Industries, Inc.,* 31 B.R. 1005 (D.C.1983), *aff'd in part* 792 F.2d 1140 (D.C.Cir.1986) noted the following:

... the debtor argues that there has been no "discharge" of Steag or Sleigh [non-debtor plan funders] as that term is defined under the Bankruptcy Code, 11 U.S.C. § 524, and, that therefore, the principle set forth in [*First Nat. Bank of*

*Herkimer v. Poland Union* [109 F.2d 54] is inapposite to the present case. Rather than granting a discharge, the plan provides that any creditor may individually and *voluntarily* release Steag and Sleigh of any alleged liability in return for the extremely valuable consideration tendered by Steag and Sleigh. Hawley and Bruce [objecting creditors] are completely free to pursue any rights they may have against these entities. Release of these rights was not even tied to acceptance or rejection of the planl, although the debtors argue that it might legally have been.

31 B.R. at 1010.

A voluntary election to release non-debtors is not present in the present plan before the court. The release provisions require that Elsinore, Hyatt Tahoe, Four Queens, among others, shall be deemed discharged and released from any and all claims. *See* Article 25.4 of the Debtors' Third Amended Joint Plan of Reorganization. Additionally, as a condition precedent to effective date, the official committee of unsecured creditors, by its counsel, shall execute and deliver a general release to Elsinore on the effective date. *See* Article 24.3 of the Debtors' Third Amended Joint Plan of Reorganization.

Because the plan provisions in the instant case are distinguishable from the plan provisions involved in *Monroe Well* and *AOV,* those cases are inapposite to the proceedings presently before this court, and, accordingly, the release provisions in the Plan are prohibited by the Bankruptcy Code and relevant case law.

The debtors urge that this court adopt the reasoning of the court in *MacArthur Co. v. Johns–Manville Corporation,* 837 F.2d 89 (2d Cir.1988) and *In re Johns–Manville Corporation,* 801 F.2d 60 (2d Cir. 1986), to the case at bar.

In the case of *MacArthur Co. v. Johns–Manville Corporation,* 837 F.2d 89 (2d Cir. 1988), MacArthur Company and Western MacArthur Company ("MacArthur"), a distributor of Manville's asbestos products, was a coinsured under some of Manville's insurance policies pursuant to "vendor en-

dorsements." MacArthur objected to the Bankruptcy Court's approval of the insurance settlements on the ground that the proposed injunctions would impair its rights under the vendor endorsements. Nonetheless, the Bankruptcy Court dismissed MacArthur's objections, approved the settlements and enjoined all suits against the insurers. MacArthur appealed, contending primarily that the Bankruptcy Court lacked jurisdiction and authority to enjoin suits against Manville's insurers. MacArthur argued that the injunctive orders constitute a *de facto* discharge in bankruptcy of nondebtor parties not entitled to the protection of Chapter 11. *See MacArthur Co. v. Johns–Manville Corp., supra,* 837 F.2d at 91.

Johns–Manville filed for Chapter 11 relief largely in response to its potential liability to persons with latent asbestos-related disease caused by Manville's asbestos products. This liability has the potential to reach more than two billion dollars. The Second Circuit noted:

> At the time of its Chapter 11 filing, Manville was engaged in extensive litigation with its insurance carriers concerning its coverage for asbestos-related liabilities. In order to avoid the uncertainty of the insurance litigation and to provide funding for its plan of reorganization, Manville endeavored to settle its insurance claims. Between 1984 and 1986, the insurers agreed to settle with Manville for approximately $700 million. The settlements provided that, in exchange for cash payments, the insurers would be relieved of all obligations related to the disputed policies and the insurers would be protected from claims based on such obligations by injunctive orders of the Bankruptcy Court. The insurers are entitled to terminate the settlements if the injunctive orders are not issued or if they are set aside on appeal. Since the insurance settlements are a cornerstone of Manville's proposed plan of reorganization, *see Johns–Manville Corp. v. Asbestos Litigation Group (In re Johns–Manville),* 33 B.R. 254, 267 (Bankr.S.D. N.Y.1983), the Bankruptcy Court's or-

ders are a critical part of the entire reorganization.

*In re Johns–Manville Corp., supra,* 837 F.2d at 90.

The Second Circuit Court of Appeals held that any rights MacArthur had in Manville's insurance policies as an insured vendor are completely derivative of Manville's rights as the primary insured. *MacArthur Co. v. Johns–Manville Corp, supra,* 837 F.2d at 92. Such derivative rights are no different from those of asbestosis victims who have already been barred from asserting direct actions against the insurers. *Id.* MacArthur seeks to collect out of proceeds of Manville's insurance policies on the basis of Manville's conduct, just as asbestosis victims. *Id.* at 92–93. In both cases, plaintiffs' claims are inseparable from Manville's own insurance coverage and are consequently well within the bankruptcy court's jurisdiction over Manville's assets, namely the insurance policies, under § 541. *Id.* at 93, *citing, In re Davis,* 730 F.2d 176, 183 (5th Cir.1984). The Second Circuit determined that the bankruptcy court properly exercised jurisdiction over the insurance policies and further held that the bankruptcy court did not exceed its authority in approving settlements thereby channeling claims arising under the policies to the proceeds of the settlement. *MacArthur Co. v. Johns–Manville, supra,* 837 F.2d at 93.

ESA contends that if a bankruptcy court has the power to enjoin suits against nondebtor third parties, as in *Johns–Manville,* it has the power to order the release of claims. Such an interpretation and extension of the Second Circuit's holding is inappropriate. The bankruptcy court in *Johns–Manville* was dealing with claims against property of the estate under § 541, which are subject to the court's jurisdiction. The Second Circuit stated:

> Numerous courts have determined that a debtor's insurance policies are property of the estate, subject to the bankruptcy court's jurisdiction. During earlier proceedings in the present case, the Bankruptcy Court held that the automatic stay provisions of the Code, 11 U.S.C.

§ 362(a) (1982 & Supp. IV 1986), which prevents suits against the debtor or his property after a petition is filed, authorized an injunction that barred claims by asbestos victims against Manville's insurers in jurisdictions allowing direct actions against the insurers. *Johns–Manville Corp. v. Asbestos Litigation Group (In re Johns–Manville), supra,* 26 B.R. [420] at 435–36 (on rehearing), *aff'd,* 40 B.R. [219] at 230–31. The Court found that Manville's insurance policies and their proceeds were "substantial property of the Manville estate which will be diminished if and to the extent that third party direct actions against the insurance carriers result in plaintiffs' judgments." 26 B.R. at 435. The Fifth Circuit has followed this analysis, enjoining suits against Manville's insurers in Louisiana, a state that permits direct actions. *See In re Davis,* 730 F.2d 176, 184 & n. 25 (5th Cir.1984). Other courts are in agreement. *E.g., A.H. Robbins Co. v. Piccinin (In re A.H. Robbins Co.),* 788 F.2d 994, 1001–02 (4th Cir.), *cert. denied,* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986); *Pearl–Wick Corp. v. John Hancock Mutual Life Insurance Co. (In re Pearl–Wick Corp.),* 15 B.R. 143, 148 (Bankr.S.D.N.Y.1981), *aff'd,* 26 B.R. 604 (S.D.N.Y.), *aff'd,* 697 F.2d 295 (2d Cir. 1982); *In re Moskowitz,* 13 B.R. 357, 360 (Bankr.S.D.N.Y.1981); *Brenham v. Deerfield Organization, Inc. (In re Norman Industries),* 1 B.R. 162, 166 (Bankr. W.D.La.1979).

*MacArthur Co. v. Johns–Manville Corp., supra,* 837 F.2d at 92.

The injunctive orders issued by the bankruptcy court were necessary to effectuate the court's channeling authority, that is, to make sure that claims to Manville's insurance proceeds were, in fact, channeled to the settlement fund and could not be asserted directly against the insurers. *MacArthur Co. v. Johns–Manville Corp., supra,* 837 F.2d at 93. As additional authority for the injunctions, the Second Circuit cited § 105(a), which permits the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

11 U.S.C. § 105(a). The bankruptcy court in *Manville* found as a fact that to permit actions against Manville's insurers arising from Manville's policies would adversely affect property of the estate and would interfere with the reorganization. *MacArthur Co. v. Johns–Manville, supra,* 837 F.2d at 93, *citing, Johns–Manville Corp. v. Asbestos Litigation Group,* 26 B.R. 420, 435–36 (Bankr.S.D.N.Y.1983), *aff'd,* 40 B.R. 219 (S.D.N.Y.1984). Thus, the injunctions issued were warranted.

In the instant case, ESA requests, in the alternative, an injunction by this court against creditors of ESA enjoining them from pursuing actions against third party plan funders. To extend the holding in *Johns–Manville* to this situation is based neither in law nor logic. This court may properly invoke its jurisdiction over creditors of ESA when these creditors' actions may effect property of the estate. However, for this court to delve into the rights of these creditors against third parties not before this court is an over-extension of this court's jurisdiction. Additionally, to cloak such action under the guise of this court's equitable power under § 105 would result in an exercise of unfounded judicial fiat.

ESA further urges this court that it may use its equitable powers under § 105 to enjoin proceedings in other courts to insure the efficient administration of the estate, *citing In re Johns–Manville Corporation,* 801 F.2d 60, 64 (2d Cir.1986). In that case, the debtor and the Legal Representative of future tort claimants came to terms in formulating a plan that would earmark billions of dollars for payment to present and future asbestos is victims as well as other creditors. The proposed plan would dilute the equity in the debtor by 90% or more. Displeased with that prospect, the Equity Committee brought an action in Delaware state court seeking to compel Manville to hold a shareholders' meeting with the avowed purpose of replacing Manville directors so that new directors might reconsider submitting the proposal plan.

On Manville's motion, the bankruptcy court issued an injunction prohibiting the Equity Committee from pursuing the Delaware action on the ground that the holding if the shareholders' meeting would obstruct Manville's reorganization. The district court affirmed. On appeal, the Equity Committee argued, among other things, that the district court erred in finding that the bankruptcy court had jurisdiction to issue the injunction.

In finding that the bankruptcy court had jurisdiction to issue the injunction, the Second Circuit stated:

> Injunctions are authorized under 11 U.S.C. § 105(a) (1982), which empowers the bankruptcy court to issue any order necessary or appropriate to carry out the provisions of the Code, including orders restraining actions pending elsewhere. *See In re Davis*, 730 F.2d 176, 183–84 (5th Cir.1984) ("[A] bankruptcy court is authorized, once jurisdiction is established, to 'issue any order, process, or judgment that is necessary to appropriate to carry out the provisions of this title.' This provision includes the authority to enjoin litigants from pursuing actions pending in other courts that threaten the integrity of a bankrupt's estate."). Section 105(a) does not, however, broaden the bankruptcy court's jurisdiction, which must be established separately under 28 U.S.C. § 157 (Supp. II 1984) 11 U.S.C. § 105(c) (Supp. III 1985).

*In re Johns–Manville Corp., supra*, 801 F.2d at 63. The bankruptcy court found that the request for an injunction was a core proceeding, encompassing " '[m]atters concerning the administration of the estate.' " *Id.* at 63–4, *citing, In re Johns–Manville Corp.*, 52 B.R. 879, 890 (Bankr.S. D.N.Y.1985). The Equity Committee contended that such proceedings were non-core and therefore, the bankruptcy court was without jurisdiction. The Second Circuit stated:

> if the bankruptcy court may ever use its equitable powers under section 105(a) to enjoin actions pursued in other courts as "concerning the administration of the estate" under section 157(b)(2)(A), it may exercise that power where there is a

basis for concluding that rehabilitation, the very purpose for the bankruptcy proceedings, might be undone by the other action. We therefore conclude that the bankruptcy court had jurisdiction to issue the injunction.

*In re Johns–Manville Corp., supra*, 801 F.2d at 64.

The *Manville* court properly invoked jurisdiction because the matter was a core proceeding under 28 U.S.C. § 157(b)(2)(A). To extend this jurisdiction over non-debtor third parties by granting a release, regardless of its effect on the administration, is beyond this court's jurisdiction grant of authority. In the case of *In re A.J. Mackay Company*, 50 B.R. 756, 762–63 (D.Utah 1985), the court noted:

> In a Chapter 11 case, the only properly invoked jurisdiction is that over the debtor himself and his property. To hold that the bankruptcy court also has jurisdiction over anyone that might "pressure" the debtor or over any property that might "assist" the debtor in reorganizing is to expand jurisdiction beyond limit. Jurisdiction exists only over the debtor and his property, and no further.

Some courts have identified 11 U.S.C. § 105 as a source of jurisdictional power to stay creditor actions against non-bankrupt codebtors. *See, e.g., In re Landmark Air Fund II*, 19 B.R. 556, 599 (Bankr.N.D.Ohio 1982). While that may be true for temporary stays that terminate when a plan is confirmed, it is not true for a stay which is embodied in a confirmed plan or which extends beyond confirmation. A bankruptcy court judgment must be based on either in rem or in personam jurisdiction that has been properly invoked. Section 105 does not supplant that requirement. Instead, the broad, rather vague, jurisdictional powers of § 105 are constrained by that fundamental jurisdictional requirement.

As long as the protection ends at confirmation, the power to stay creditors is similar to the power to subpoena non-party witnesses or to impose sanctions

against non-party witnesses who are in civil contempt. Such powers are necessary to enable a court to properly conduct the adjudicatory process. They are procedural powers, not substantive powers. They must be used only to properly proceed to a final judgment, and can have no effect on the final judgment or after the final judgment. Consequently, while a stay may be an appropriate exercise of power in extraordinary cases to enable a proposed plan to be prepared, it cannot be a part of a confirmed plan. *Cf. In re Larmar Estates, Inc.,* 5 B.R. 328, 331 (Bankr.E.D.N.Y.1980) (noting that the issue was whether a stay could issue until a plan was confirmed or the case was converted to a Chapter 7 case). 50 B.R. at 762–63.

The present release and discharge provisions of the plan stand as an obstacle to confirmation of the plan as presently constituted. In the event that the plan is capable of amendment consistent with this court's ruling the court will rule upon the other elements of § 1129(a).

The debtors seek in this matter confirmation under § 1129(a). Accordingly, the court must examine the various other requirements of that subsection.

Section § 1129(a)(1) provides:

(a) The court shall confirm a plan only if all of the following requirements are met:

(1) The plan complies with the applicable provisions of this title.

As set forth above, the present release and discharge provisions of the amended plan violate § 524(e) of the Bankruptcy Code and accordingly violate § 1129(a)(1). This court must also here determine whether the plan complies with other applicable provisions.

Section 1122 of the Bankruptcy Code requires:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such claims.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

Section 1122 of the Code requires that all claims which are classed together be substantially similar. Such a requirement insures that large claims of a differing legal natures do not dictate the other claims within a class. *Matter or Rochem, Ltd.,* 58 B.R. 641, 642 (Bankr.D.N.J.1985).

As set forth at length above the plan consists of twelve classes of claims and interests, with varying payment provisions. The court finds that the claims of each class are substantially similar to meet the requirements of § 1122(a).

A plan must also comply with the requirements of § 1123 which provides:

(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—

(1) designate, subject to section 1122 of this title, classes of claims, other than claims of a kind specified in section 507(a)(1), 507(a)(2), or 507(a)(7) of this title and classes of interests;

(2) specify any class of claims or interests that is not impaired under the plan;

(3) specify the treatment of any class of claims or interests that is impaired under the plan;

(4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular or interest agrees to a less favorable treatment of such particular claim or interest;

(5) provide adequate means for the plan's implementation, such as—

(A) retention by the debtor of all or any part of the property of the estate;

(B) transfer of all or any part of the property of the estate to one or more entitles, whether organized before or after the confirmation of such plan;

(C) merger or consolidation of the debtor with one or more persons;

(D) sale of all or any part of the property of the estate, either subject to or free of any lien, or the distribution of all or any part of the property of the estate among those having an interest in such property of the estate;

(E) satisfaction or modification of any lien;

(F) cancellation or modification of any indenture or similar instrument;

(G) curing or waiving of any default;

(H) extension of a maturity date or a change in an interest rate or other term of outstanding securities;

(I) amendment of the debtor's charter; or

(J) issuance of securities of the debtor, or of any entity referred to in subparagraph (B) or (C) of this paragraph, for cash, for property, for existing securities, or in exchange for claims or interests, or for any other appropriate purpose;

(6) provide for the inclusion in the charter of the debtor, if the debtor is a corporation, or of any corporation referred to in paragraph (5)(B) or (5)(C) of this subsection, of a provision prohibiting the issuance of nonvoting equity securities, and providing, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends; and

(7) contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee.

11 U.S.C. § 1123(a).

Claims and interests are classified in Article 5 of the plan.

Article 19 identifies claims and equity interests not impaired by the plan. Articles 7, 8, and 10 through 17, inclusive, specify the treatment of impaired classes. Each claim or interest of a particular class is afforded the same treatment under the plan. Adequate means for the plan's implementation are set forth as follows:

The means for execution of the Plan are further set forth in Article 2. Specifically, as contemplated under section 1123(a)(5), the Plan provides that new financing will be obtained through the mortgaging of the Western properties. The debtor entities shall be restructured in the manner provided in Article 2, § 2.2 of the Plan. The Elsinore Subrogation Claims shall be evidenced by the delivery of the Elsinore Note to Elsinore and the assignment of the EFC Note to Elsinore as collateral for EFC's obligations under the Elsinore Note. All rights under the Elsinore Note shall be subordinate to the rights under the New Indenture and the New Senior Mortgage Bonds (Article 2, § 2.3 of the Plan). Additionally, ESA shall enter into a Parent Services Agreement with Elsinore (Article 2, § 2.4 of the Plan).

Certain conditions precedent to the closing and consummation of the Plan have been enumerated in Article 24 of the Plan. Section 24.1 provides that ESA obtain all the requisite regulatory and gaming approvals in the State of New Jersey and Nevada. Section 24.2 requires the dismissal with prejudice on confirmation of certain litigation commenced by the Indenture Trustee against Elsinore and all other litigation by or on behalf of Senior Mortgage Bondholders and Indenture Trustee against the Proponents. Section 24.2 provides for execution and delivery of the Rescission Agreement to Elsinore. Section 24.3 provides for the execution and delivery of various releases and discharges. Section 24.4 requires the affirmative vote with respect to adoption of the Plan by 95 percent in principal amount of the Senior Mortgage Bonds and of the Subordinated Debentures. All conditions precedent to the Western Refinancing must be completed pursuant to section 24.5. All necessary consents and approvals under the Elsinore Subordinated

Indenture for the transactions contemplated by the Plan shall be completed pursuant to section 24.6. Certain Charter and ESA Partnership Agreement amendments must be executed pursuant to sections 24.-10 through 24.12. The Playboy District Court Action, Bankruptcy Court Action and the Elsub involuntary chapter 11 case shall be dismissed with prejudice by Playboy under section 24.8. The New Indenture must be duly executed and delivered into escrow under section 24.9.

In accordance with section 1123(a)(6), amendments of the charters of the corporate Debtors to prohibit the issuance of non-voting equity securities are required under section 24.7. Finally, in compliance with section 1123(a)(7), the Plan contains only provisions consistent with the interests of creditors and equity security holders as well as public policy with respect to the manner of selection of any officer, director or trustee under the Plan.

Section 1123(b) specifies five permissive provisions that may be included in the Plan. Subsection (1) provides that a plan may impair or leave unimpaired any class of secured or unsecured claims or interests. As noted above, Article 19 of the Plan identifies two unimpaired classes; all other classes are impaired, the treatment of which is set forth in Articles 7, 8 and 10 through 17, inclusive.

The plan identified two unimpaired classes, leaving all other classes impaired, as allowed by § 1123(b)(1); Article 20 of the plan provides for the assumption of executory contracts and unexpired leases, as allowed by § 1123(b)(2); the plan provides for settlement of a certain land sale rescission, as allowed by § 1123(b)(3). Accordingly, the plan satisfies § 1122 and § 1123 of Title 11.

Section § 1129(a)(2) requires that "the proponent of the plan complies with the applicable provisions of this title. In the case at bar this Court on December 23, 1987 entered an order approving the adequacy of the Disclosure Statement relating to the plan before this court, pursuant to 11 U.S.C. § 1125(b). Affidavits of mailing have been filed with ths court on February

8, 1988 indicating that a copy of the Disclosure Statement, debtor's third amended joint plan, and ballots were mailed to each known holder of an impaired claim or interest as required by § 1125. Accordingly, the requirements of § 1129(a)(2) are met.

11 U.S.C. § 1125(b) provides:

(b) An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets.

■ The Funds assert herein as an objection to confirmation that "the said plan of Reorganization should not be confirmed since the acceptances thereto were obtained by a false and misleading Disclosure Statement, the approval of which is on appeal. No order of confirmation should be entered until that appeal is decided", and that the bankruptcy court has set a hearing on confirmation without deciding various litigation that has been filed with the said court and has not been heard by the court, or if heard, has not been decided by the court, including, but not limited to: (a) a motion originally filed by the Funds for appointment of a trustee, and; (b) a motion filed by ESA for rescission of a real estate transaction which has been fully tried and briefed.

This court by an oral decision made of record on December 1, 1987 directed certain amendments to the Disclosure Statement, which were complied with, and subsequently by order of December 23, 1987 approved that Disclosure Statement, with further modifications made on the record that date. That order was appealed to the United States District Court.

The United States District Court by a written opinion dated February 3, 1988 ruled that the order approving the Third

Amended Disclosure Statement was an interlocutory order from which the Funds had no right of appeal. While the Funds have a right to seek a further appeal of that decision, this court finds no grounds for a stay of enforcement of its December 23, 1987 order approving the debtors' disclosure statement and setting the matter down for a confirmation hearing, or a suspension of proceedings under § 305. This court may stay enforcement of an order or stay proceedings generally. The issuance of a stay pending appeal is governed by Bankruptcy Rule 8005. Stays pending appeal are in the nature of a preliminary injunction and the standard is similar:

(1) The applicant must make a strong showing that he is likely to succeed on the merits of the appeal;

(2) The applicant must show that unless the stay is granted, he will suffer irreparable injury;

(3) The applicant must show that no substantial harm will be suffered by other uninterested parties;

(4) The granting of the stay will not harm the public interest.

*See In re Great Barrington Fair & Amusement Inc.*, 53 B.R. 237, 239 (Bank. D.Mass.1985). The first prong puts the court in the position of reviewing its own order. The standards for approval of a disclosure statement and what constitutes adequate information was set forth at length in this court's opinion rendered on the record on December 1, 1987. The court will incorporate those findings in this record. The district court on appeal found no right to appeal, based upon a finding that the order at issue of December 23, 1987 was interlocutory. On a review of both those opinions this court finds that the Funds have failed to make a sufficient showing that they will succeed on appeal. More critically the Funds have failed to show that they will be irreparably harmed by a denial of the stay. The issues raised by the Funds in its motion and its objection to approval of the disclosure statement are addressed by the confirmation process. On the other hand, if a stay is granted, the other interested parties, including the debt-ors, its other creditors and the public will suffer harm by the delay caused by such a stay. *See e.g. In re Great Barrington Fair & Amusement Inc.*, 53 B.R. at 240.

A delay of proceedings will substantially harm creditors and the debtors alike. The harm to the Funds is much less. The Funds, through the confirmation process, will be heard as a creditor and party in interest on the discrete confirmation issues implicated by § 1129.

This court having found the Disclosure Statement to contain adequate information, and finding no basis for a stay of proceedings, finds that acceptances were not obtained by false and misleading information and accordingly, that the acceptances to that plan are valid.

Nor does this court believe that it must decide the Funds' motion for the appointment of a trustee before ruling on confirmation. The discrete confirmation issues are and will continue to be addressed by this court. The court, by a separate written opinion, has granted ESA's motion for rescission of the land sale agreement and and includes those findings in this record. Accordingly, the requirements of § 1129(a)(2) are met.

Section § 1129(a)(3) requires that "the plan has been proposed in good faith and not by any means forbidden by law."

In the case at bar the Funds assert that the plan violates the absolute priority of payment rule in that the unsecured creditors have not been paid in full and other creditors who are lower in priority than the unsecured creditors are being paid various sums of money including but not limited to the debts of the parent corporation of the debtor [Elsinore] and Debtors' ex-partner, Playboy, and that the said plan is not fair and equitable in that said plan is a constructive fraud on unsecured creditors since the debtor proposes paying off the guaranteed debts of its parent corporation, Elsinore, in full before unsecured creditors are paid.

The Funds, in its "Brief in Support of the Funds' Objections to Confirmation", filed on February 16, 1988, assert that the plan

should not be confirmed because it is a constructive fraud on unsecured creditors because marshalling and equitable subordination are appropriate.

The Court will address the issues of good faith and constructive fraud in terms of the doctrines of marshalling and equitable subordination seriatum.

"Bad faith" is not defined by the bankruptcy code, however, bad faith has been broadly defined as:

> The opposite of 'good faith,' generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Term 'bad faith' is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will.

Black's Law Dictionary 127 (5th ed. 1979). The existence of bad faith is determined by an examination of the totality of the factors at issue. *See, Camelot, Inc. v. Hayden,* 30 B.R. 409, 411 (E.D.Tenn.1983).

■ In the context of reorganization under Chapter 11, a plan is proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code. *In re Toy & Sport Warehouse, Inc.,* 37 B.R. 141, (Bankr.S.D.N.Y.1984); *In re Nite Lite Inns,* 17 B.R. 367 (Bankr.S.D.Cal. 1982). Thus, the court may consider a debtor's pre-filing conduct as well as the feasibility of the plan itself. *In re Toy & Sport Warehouse, Inc., supra,* 37 B.R. at 149, *citing In re Madison Hotel Associates,* 29 B.R. 1003, 1009 (D.C.W.D.Wis. 1983).

In the case before the court, the debtors have acted diligently throughout the course of these proceedings to negotiate with the various creditor classes, to obtain a consensual plan of reorganization. Jeanne Hood, the president of Elsinore and its subsidiaries including the debtors before this court testified that she has over the course of these proceedings met for approximately two years with creditor constituencies, including the two bondholder constituencies, the official unsecured creditors' committee, the Class 4 secured creditors, First Fidelity Bank, and Playboy, with the aim to organize the capital structure and the operation of the Atlantis so that it can be put on a more secure financial basis and can operate as a going concern and service its debts after Chapter 11. (*See* Tr. of 2/9/88 at 54–61). Ms. Hood also testified to the institution of cost saving by the Atlantis, including cuts in employees from in excess of 3,100 people to between 1,800 and 1,900 (*See* Tr. of 2/9/88 at 12), the cutting down of junket programs and headliner entertainment and the institution of different market and advertising programs aimed at middle-level players. (*See* Tr. of 2/9/88 at 13).

Stephen Cooper, a member of the firm of Zolfo, Cooper & Co. testified regarding the debtors' projections of operations. Zolfo, Cooper & Co. was retained by Elsinore Corporation to render consulting and accounting services. (*See* Tr. of 2/8/88 at 44–45).

The projected operations for the debtors for 1988, the debtors' first post-confirmation fiscal year, reflects a book loss of $13,489,000.00 on revenues of $113,840,-000.00. (Unaudited Projected Consolidated Statements of Operations of Elsub Corporation and Subsidiaries, D–8). The actual numbers on an unaudited basis for 1987 reflect a book loss of $24,316,000 on revenues of $98,979,000.00. The projected operations for the debtors for 1989 reflect a book loss of $19,407,000.00 on revenues of $103,000,000.00. Notwithstanding the book loss of $13,489,000.00 for 1988, Cooper testified that depreciation and amortization charge of $7,782,000.00 and interest charge of $17,276,000.00 was included in that computation. If these figures aggregating $25,058,000.00 are added back, a positive cash flow of $11,569,000.00 is projected. (*See* Tr. of 2/8/88 at 104–105).

Similarly, notwithstanding the book loss of $19,407,000.00 for 1989, if the depreciation and amortization charge of $7,547,000.00 and the interest charge of $18,548,000.00 aggregating $26,095,000.00 are added back, a positive cash flow of $6,688,000.00 is achieved. (*See* Tr. of 2/8/88 at p. 106, D–8). Cooper also testified that the losses for tax purposes in addition to the existing NOLS are sufficient to assure that the Atlantis Casino will have little or no exposure to federal or state income taxes in the new term so that there is no provision for the payment of income taxes through December 31, 1989. (*See* Tr. of 2/8/88 at 105).

Cooper further explained that a nonrecurring book gain of $28,287,000.00 is projected for 1988 based upon a gain of $42,000,000.00 from reorganization where equity is swapped for debt. The projections of operations of the debtor project an increase in revenues in 1988 or 1987 from $98,979,000.00 to $113,840,000.00. This projected increase was satisfactorily explained. Cooper testified that the 1987 revenues were analyzed with the impact of a labor strike in 1987 plus an increment in market growth projected for 1988, including specific programs the management at the Atlantis Casino intended to introduce in 1988. This analysis produced total revenues of $118,000,000.00. Each profit generating funds, casino, food and beverage and hotel, was analyzed on a day-by-day and month-by-month build-up. This method produced $114,000,000.00, the approximate number that was utilized in the projections.

Cooper further explained that the 1988 and 1989 projections do not take into account any continued financial impact of the ongoing strike at the Atlantis, but assume that the Atlantis will as of January 1, 1988 returned to normalcy in terms of its providing service to its customers. (*See* Tr. of 2/8/88 at 102). Cooper further explained that of approximately 600 members of Local 54 that striked, 500 have been replaced or returned to work, and services have been reconfigured so that 550 represent full staffing, so that the hotel is presently back to 90% normalcy. (*See* Tr. of 2/8/88 at 102).

As will be further discussed below, this court finds that the debtors' financial projections and assumptions are reasonable, and that the plan will achieve a result consistent with the standards prescribed under the Bankruptcy Code. Accordingly, this court finds that the requirement of § 1129(a)(3) is met.

The Funds argue that Elsinore, as an unconditional guarantor of the senior mortgage bonds should be responsible for the claims of the senior mortgage bondholders, and subordinated to the claims of the unsecured creditors. The Funds rely upon the application of the marshalling doctrine and the principle of equitable subordination.

[T]he equitable doctrine of marshalling rests upon the principle that a creditor having two funds to satisfy his debt may not, by his application of them to his demand, defeat another creditor, who may have resort to only one of the funds. *Meyer v. United States,* 375 U.S. 233, 84 S.Ct. 318, 11 L.Ed.2d 293 (1963).

The doctrine of marshalling "is not bottomed on the law of contracts or liens. It is founded instead in equity, designed to promote fair dealings and justice. Its purpose is to prevent the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security. It deals with the rights of all who have an interest in the property involved and is applied only when it can be equitably fashioned as to all of the parties." *Meyers v. United States, supra,* 375 U.S. at 237, 84 S.Ct. at 321. The *Meyers* court nonetheless recognized that state "courts have refused to apply [the doctrine of marshalling] where state-created homestead exemptions would be destroyed." *Id.*

In the absence of independent and separate equities, the doctrine of marshalling does not apply unless the litigants are (1) creditors of the same debtor, (2) the funds are assets [the rights to which are sought to be controlled by marshalling] in the hands of or owned by such common debtor and, (3) that one of them alone has the right to resort to both funds. *See Matter*

*of Multiple Services Industries, Inc.,* 18 B.R. 635, 636 (Bankr.E.D.Wis.1982); *In re Computer Room Inc.,* 24 B.R. 732, 734 (Bank.N.D.ala.1982); *In re Beacon Distributors, Inc.,* 441 F.2d 547, 548 (1st Cir.1971); *Johnson v. Lentini,* 66 N.J.Super. 398, 409–10, 169 A.2d 208 (Ch.Div.1961).

In the case of *Farmers and Merchants Bank v. Gibson,* 7 B.R. 437 (Bankr.N.D. Fla.1980), *vacated and remanded* 81 B.R. 79 (N.D.Fla.1981), the bankruptcy court made findings that the plaintiff bank loaned $150,000.00 to the corporation debtor, an automobile dealership. The corporation's promissory note was guaranteed by its president and principal stockholder, individually and also by his wife. The loan, which was obtained by working capital was secured by a second mortgage on the corporation's real estate and certain real estate, including a residence, titled in the name of the president and his wife, individually as tenants by the entirety. The mortgage encumbering both the corporate and individual property was executed by the president in his official capacity and by he and his wife as individuals. 7 B.R. at 438. The court also made a finding that when the original balance of the initial loan had been paid down to $75,000.00, a further advance of $50,000.00 was made by and a second promissory note in that sum executed not only by the corporation as maker, but the president and his wife as co-makers. *Id.*

The court held that the Bank's lien should be paid to the extent of proceeds available from the property titled in the corporate name, less a reasonable minimum reserve to be determined, and its lien instead of being diminished by the amount of said payment should be preserved by order of the court and transferred to the defendant trustee under his right to be equitably subrogated to the Bank's lien. 7 B.R. at 443.

In finding such relief, the court stated:
Here, the foreseeable and likely result of obtaining such working capital, partly on the strength of the guarantor's personal liability and any property which the guarantor may have specifically pledged to secure such guaranty, is the inducement of others to innocently commence or continue to extend supplies or services to the principal on credit.

Upon the failure of the business and in a marshaling context, the balance of equities tips in favor of the creditors of the principal as against the guaranty claimant with respect to any individually owned property which was specifically pledged to secure the guaranty and obtain working capital. Unlike the ordinary nonbusiness related guaranty case, here, the court, in view of the "additional equitable consideration", conclude that the individually owned property must be regarded in equity as a contribution to capital. *Moser Paper Co. v. North Shore Publishing Co.,* 83 Wis.2d 852, 266 N.W.2d 411 (1978); *Gotzian & Co. v. Shakman,* 89 Wis. 52, 61 N.W. 304 (1894).

7 B.R. at 441.

The district court, on appeal, vacated the bankruptcy court's order and remanded the case for further findings[2] on whether the individuals were the makers of the second note, and whether the mortgages were contributions to capital. 81 B.R. at 80. On remand, the bankruptcy court determined that the remaining individual property mortgaged to the Bank was homestead property and that the right of the homestead claimant was superior or at least equal to the rights of the junior lienholders to have the assets marshaled. *Farmers and Merchants Bank v. Gibson,* 81 B.R. 81 (Bankr.N.D.Fla.1984). By subsequent decision the bankruptcy court explained that the foreclosure sale of remaining non-homestead property was still pending. However, the court found that a deficiency would exist on the Bank's debt to force foreclosure on the homestead property. Accordingly, the court held that a junior creditor could not directly through marshaling by injunction or by indirectly through marshaling by way of subrogation nullify the protections of law provided a homesteader. *Farmers and Merchants Bank v. Gibson,* 81 B.R. 83 (Bankr.N.D. Fla.1984), *aff'd* 81 B.R. 84 (N.D.Fla.1986).

In *In re Jack Green's Fashions*, 597 F.2d 130 (8th Cir.1979) the real estate of two corporate officers was marshalled where the Eighth Circuit affirmed a decision of the district court requiring a secured creditor to proceed against certain parcels of real estate owned by the debtor corporation's officers, also in bankruptcy, prior to proceeding against the business assets of the bankrupt corporation. In that case the secured creditor, Centennial Bank & Trust of Mission, Kansas, held a lien on the business assets of the debtor corporation and an additional lien on three parcels of real estate owned by two of the debtor's principal officers and their wives as tenants by the entirety. The trustee of all three estates filed an application with the bankruptcy court to require a marshalling of assets which would require the Bank to proceed gainst the parcels of real estate before proceeding against the business assets of the corporation.

This decision has been the subject of criticism. Most recently, in bankruptcy court this this district in the case of *In re Corso Stein Enterprises, Inc.*, 79 B.R. 584, 587 (Bankr.D.N.J.1987), in an opinion by Bankruptcy Judge William Gindin, stated:

> More troubling is the chief case relied upon by the trustee, *In re Jack Green's Fashions for Men—Big and Tall, Inc.*, 597 F.2d 130 (8th Cir.1979). The court simply relied on equitable principles and extended the doctrine of marshaling. No specific finding of fraud was made and the court did not argue that it was piercing the corporate veil. No other cases have gone as far as the Eighth Circuit in *Jack Green's*. Judge Wright in *In re The Computer Room, supra*, rejected the case as being inconsistent with the historical background of the doctrine. Judge Elliott in *In re United Medical Research, Inc.*, 12 B.R. 941 (Bankr.C.D. Cal.1981) likewise considered *Jack Green's* to be an anomalous result.
>
> In the absence of some law pursuant to which this court has authority to pierce the corporate veil, this court must also reject the *Jack Green's* reasoning as having no support in history or in law. The burden of proof for one seeking to go beyond the corporation is a heavy one. There must be some basis upon which the court relies.
>
> > The circumstances under which the court should disregard the corporate fiction are not always clear and it is difficult, if not impossible, to formulate a precise and categorical definition applicable to all situations, ... each case being *sui generis*. The burden, however, in each case rests upon the plaintiff to establish that there is a basis which serves for disregard of the corporate form ...

79 B.R. at 588, *citing Brunswick Corp. v. Waxman*, 459 F.Supp. 1222, 1229 (D.N.Y. 1978) *aff'd*, 599 F.2d 34, (2d Cir.1979).

In the case at bar, the Funds have not met any of the standards for marshalling. First, as argued by debtors' counsel, this is not a situation of a junior lienor asserting marshalling as against a senior lienor. At most, the debtor-in-possession, ESA, could assert a claim against its parent, Elsinore, on behalf of the unsecured creditor class. Secondly, there are not two funds owned by the debtor. Elsinore's guaranty is not property of ESA or any of the other debtor entities. The only fund of the debtor, ESA, is the casino property which secures the mortgage. Thirdly, this court finds that to compel the secured bondholders to marshall an unsecured guarantee of Elsinore, and forego proceeding against the mortgage on the debtor's property would be so prejudicial as to result in the inapplicability of this equitable doctrine.

The Funds also argue that Elsinore Corporation should be subordinated to the claims of the unsecured creditors of ESA under the principal of equitable subordination found in § 510(c)(1) of the Bankruptcy Code.

11 U.S.C. § 510(c) provides:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed

claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

The Supreme Court in the case of *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939) recognized that equitable power and duty of the bankruptcy court when passing upon allowance of claims against an estate to see that injustice or unfairness is not done in the administration of the debtor's estate. In that case the court stated:

That equitable power also exists in passing on claims presented by an officer, director, or stockholder in the bankruptcy proceedings of his corporation. The mere fact that an officer, director, or stockholder has a claim against his bankrupt corporation or that he has reduced that claim to judgment does not mean that the bankruptcy court must accord it pari passu treatment with the claims of other creditors. Its disallowance or subordination may be necessitated by certain cardinal principles of equity jurisprudence. A director is a fiduciary. *Twin-Lick Oil Company v. Marbury*, 91 U.S. 587, 588, 23 L.Ed. 328. So is a dominant or controlling stockholder or group of stockholders. *Southern Pacific Company v. Bogert*, 250 U.S. 483, 492, 39 S.Ct. 533, 537, 63 L.Ed. 1099. Their powers are powers in trust. See *Jackson v. Ludeling*, 21 Wall, 616, 624, 22 L.Ed. 492. Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. *Geddes v. Anaconda Copper Mining Company*, 254 U.S. 590, 599, 41 S.Ct. 209, 212, 65 L.Ed. 425. The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If

it does not, equity will set it aside. While normally that fiduciary obligation is enforceable directly by the corporation, or through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by the trustee. For that standard of fiduciary obligation is designed for the protection of the entire community of interests in the corporation—creditors as well as stockholders.

As we have said, the bankruptcy court in passing on allowance of claims sits as a court of equity. Hence these rules governing the fiduciary responsibilities of directors and stockholders come into play on allowance of their claims in bankruptcy. In the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate.

308 U.S. at 306–08, 60 S.Ct. at 245–46.

The court in *Pepper v. Litton* went on to note those instances where claims of officers, directors and stockholders in bankrupt corporations may be disallowed or subordinated:

Thus, salary claims of officers, directors, and stockholders in the bankruptcy of "one-man" or family corporations have been disallowed or subordinated where the courts have been satisfied that allowance of the claims would not be fair or equitable to other creditors. And that result may be reached even though the salary claim has been reduced to judgment. It is reached where the claim asserted is void or voidable because the vote of the interested director or stockholder helped bring it into being or where the history of the corporation shows dominancy and exploitation on the part of the claimant. It is also reached where on the facts the bankrupt has been used merely as a corporate pocket of the dominant stockholder, who, with disregard of the substance or form of corporate management, has treated its affairs as his own. And so-called loans or advances by the dominant or control-

ling stockholder will be subordinated to claims of other creditors and thus treated in effect as capital contributions by the stockholder not only in the foregoing types of situations but also where the paid-in capital is purely nominal, the capital necessary for the scope and magnitude of the operations of the company being furnished by the stockholder as a loan.

Though disallowance of such claims will be ordered where they are fictitious or a sham, these cases do not turn on the existence or non-existence of the debt. Rather they involve simply the question of order of payment. At times equity has ordered disallowance or subordination by disregarding the corporate entity. That is to say, it has treated the debtor-corporation simply as a part of the stockholder's own enterprise, consistently with the course of conduct of the stockholder. But in that situation as well as in the others to which we have referred, a sufficient consideration may be simply the violation of rules of fair play and good conscience by the claimant; a breach of the fiduciary standards of conduct which he owes the corporation, its stockholders and creditors. He who is in such a fiduciary position cannot serve himself first and his cestuis second. He cannot manipulate the affairs of his corporation to their detriment and in disregard of the standards of common decency and honesty. He cannot by the intervention of a corporate entity violate the ancient precept against serving two masters.

308 U.S. at 308–11, 60 S.Ct. at 246–47.

 A stockholder's loans to his company will be treated as capital contributions when under the equities, a company is deemed undercapitalized. *Matter of Multiponics, Inc.*, 622 F.2d 709, 717 (5th Cir. 1980), *citing Pepper v. Litton, supra, Taylor v. Standard Gas Co.*, 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939). The mere fact of an insider loan may be insufficient to warrant subordination. *Matter of Multiponics, Inc., supra*, 622 F.2d at 717. In *Pepper v. Litton, supra* the Supreme Court stated that, for the purpose of determining whether claims of officers, directors or stockholders of a bankrupt corporation should be subordinated to claims belonging to other creditors, the dealings of fiduciaries with their corporation

are subjected to rigorous scrutiny and where any of their contracts or engagements is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.

308 U.S. at 306, 60 S.Ct. at 245.

The Fifth Circuit in *Matter of Mobile Steel Co.*, 563 F.2d 692 (5th Cir.1977) set forth a three-prong test providing that equitable subordination is appropriate where the following elements are established:

(1) the claimant must have engaged in some inequitable conduct;

(2) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant;

(3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act. 563 F.2d at 700. *See also, Matter of Multiponics, Inc.*, 622 F.2d 709 (5th Cir.1980).

The court in *Matter of Mobil Steel Company*, 563 F.2d 692 (5th Cir.1977) set forth the applicable burden of proof:

To constitute the type of challenge contemplated by the [Pepper v. Litton] Court, an objection resting on equitable grounds cannot be merely formal, but rather must contain some substantial factual basis to support its allegation of impropriety. Absent such a requirement, the wide-ranging inquiry authorized by the *Kansas City Journal–Post* case [144 F.2d 791 (8th Cir.1944] would place an unwarranted burden on fiduciaries by requiring them to prove the good faith and fairness of *every one* of their actions with respect to their corporation at the pleasure of the Trustee. This would be tantamount to the adoption of a rule that claims advanced by fiduciaries are invalid simply because of the nature

of the relation existing between the claimant and the bankrupt. For reasons that should be obvious—among them, a desire not to discourage those most interested in a corporation from attempting to salvage it through an infusion of capital—we have steadfastly refused to endorse such a principle.... The proper rule is that the claimant's verified proof of claim obliges the objecting trustee to come forward with enough substantiations to overcome the claimant's *prima facie* case and thus compel him to actually prove the validity and honesty of his claim.

563 F.2d at 701 (citations omitted). [emphasis in original]

The Third Circuit in the case of *United States v. Pisani*, 646 F.2d 83 (3d Cir.1981) in fashioning a federal rule on the alter ego theory set forth the relevant factors:

> *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.*, 540 F.2d 681 (4th Cir. 1976), sets out in detail the relevant factors:
>
> > First is whether the corporation is grossly undercapitalized for its purposes. Other factors are
> >
> > "... failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders."
> >
> > *Id.* at 686–87 (footnotes omitted). Also, the situation "must present an element of injustice or fundamental unfairness," but a number of these factors can be sufficient to show such unfairness. *Id.* at 687.

646 F.2d at 88.

In the case of *Federal Deposit Insurance Corp. v. Sea Pines Company*, 692 F.2d 973 (4th Cir.1982), *cert. denied*, 461 U.S. 928, 103 S.Ct. 2089, 77 L.Ed.2d 299 (1983), the Federal Deposit Insurance Company ("FDIC") appealed from a decision of the district court which declined to pierce the corporate veil where the FDIC alleged that Sea Pines Company, the parent, guaranteed a particular indebtedness of its subsidiary, Point South Inc. to the American Bank & Trust Company, ("AB & T") predecessor in interest to FDIC. In that case Sea Pines Company, the parent, utilized a number of subsidiary corporations. One of its subsidiaries, Point South, Inc. was initially capitalized with $1,000.00 by two of the three-person executive committee of the parent company. The subsidiary issued one hundred shares of capital stock and later 10% of its stock was transferred to Continental Mortgage Investors and the remaining 90% of the stock was assigned to the parent company. In February 1973 Point South Inc. obtained a construction loan mortgage to build a reception center on commercial property that the subsidiary owned. In August 1973 the subsidiary desired to sell the property to Points South Associates, a limited partnership, and lease it back. The rent, payable to Point South Inc., the subsidiary, to Point South Associates, the limited partnership, was guaranteed by Sea Pines Company, the parent, by a formal guarantee. This transaction was finalized on September 7, 1973. In October 1974 the subsidiary, Points South Inc. and Sea Pines Company, acting through the common directors mortgaged the equity of Point South Inc. in a 76 acre tract, as collateral for the loans of Sea Pines Company, the parent. The parent credited the debts which the subsidiary owed to the parent as alleged consideration for the subsidiary mortgaging its property and allowing the proceeds to go to the parent. In May 1975 the common directors of the corporations caused the sale and leaseback between Point South Inc. and Point South Company to be cancelled and Point South Inc. repurchased the property. Point South Inc. cancelled the note and mortgage owed to it by Point South Associates, which was originally in the sum of $55,000.00. Sea Pines Company was released by its guarantee of rent payments on the reception center. In February 1973 Point South Inc. the subsidiary had a balance sheet showing properties or assets in excess of

$2.5 million with a total net worth of $65,000.00, of which $1,000.00 was capital stock and $64,000.00 was retained earnings. The subsidiary lost $242,000.00 between February 1973 and February 1974. In February 1974, Point South Inc. was insolvent, with a negative net worth of $177,000.00. From February 1974 until February 1975, the subsidiary continued to lose money so that by February 1975 the total insolvency or negative net worth of Point South Inc. was $1,949,000.00. The Fourth Circuit reversed the decision of the district court, finding that the actions of Point South, Inc. and Sea Pines Company were fundamentally unfair to AB & T, a creditor of Point South Inc. and predecessor in interest to FDIC, 692 F.2d at 976, and remanded the matter in order that the district court might enter a judgment for the FDIC against Sea Pines Company. The court in so holding stated:

> Each of these transactions clearly shows that the board of directors of the insolvent corporation was using that corporation and its assets for the benefit of the parent, Sea Pines Company, and not for the subsidiary. The parent, through the interworking boards of directors, manipulated the assets, property and liabilities of the subsidiary. The directors voilated the fiduciary duty owed to the creditors of the insolvent Point South Inc. These two transactions clearly indicate fundamental unfairness and injustice.

692 F.2d at 977.

In the case at bar, while Elsinore and ESA had common directors and officers, ESA and Elsinore adhered to corporate formalities. Elsinore's infusion of operating funds into ESA did occur. This record does not support the application of alter ego theories to pierce the corporate veil of Elsinore. Nor does this record support a finding that Elsinore engaged in inequitable conduct in connection with the affairs of its subsidiary, ESA. There was no evidence presented that ESA was undercapitalized. Accordingly, this court rejects the theories of equitable subordination raised by the Funds herein.

The Funds maintain that Jeanne Hood cannot impartially evaluate the claims of the debtor against Elsinore and that pervasive conflicts of interest exist to render the debtors as debtors-in-possession, incapable of functioning as trustees, for creditors. As noted above, the relationship of a parent to its subsidiaries is subject to scrutiny in the context of reorganization proceedings. The same standards that courts apply to support equitable subordination or *alter ego* theories apply here. This court finds, on this record, that Elsinore has not engaged in inequitable conduct toward its subsidiaries and their creditors. This court has fully examined the proposed motion of ESA to rescind a certain land sale agreement involving the sale of properties by ESA to Elsinore. By separate opinion, that motion for rescission has been granted. As discussed later in this opinion, the debtors have asserted defenses to the alleged preference action that a debtor-in-possession or a Chapter 7 trustee might bring against Elsinore.

The Funds assert herein that Jeanne Hood acted on the advice of Charles Evans Gerber, Esquire "who was employed by Elsinore Corporation as general counsel and as special counsel and who was listed in the service sheets as general counsel to the debtor. Charles Gerber at all times during the proceeding was general counsel for Elsinore Corporation." *See* Brief in Support of the Funds' Objections to Confirmation" at p. 21.

Charles Evans Gerber, Esquire has been the Secretary of Elsinore since February 1986 and a Director of Elsinore since October 1985. This court notes that an order was entered on February 7, 1986 authorizing ESA to employ the law firm of Friedman & Koven, of which Charles Evans Gerber was a member, and the firm of Neal, Gerber & Eisenberg, then a newly formed firm with which Charles Evans Gerber became affiliated, as special counsel to ESA, in the area of partnership and securities law. The facts as set forth by the Funds are inaccurate and not sustainable. Accordingly, the requirements of 1129(a)(3) are met.

Section 1129(a)(4) requires that "Any payment made or to be made by the propo-

nent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services, or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by or is subject to the approval of the court as reasonable."

No payment for services or costs and expenses in connection with these cases, other than payments already approved by this court, have been made. Under Article 3 of the Plan only "allowed" administrative expenses shall be paid. Such payments are subject to court approval. Accordingly, the requirements of § 1129(a)(4) is met.

At the February 9, 1988 confirmation hearing, Jeanne Hood testified that certain payments were made by Elsinore to or on behalf of or for the benefit of ESA from November 13, 1984 to December 31, 1987 in the aggregate amount of $12,830,000.00. (D–16 and D–17). This court is satisfied that full disclosure has been made in this case in regard to these third-party payments.

Section 1129(a)(5) requires that "(i) The proponent of the plan has disclosed the identity and affiliation of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliation of the debtor participating in a joint plan with the debtor, of a successor to the debtor under the plan, and, (ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider."

Appendix C of the Disclosure Statement sets forth the "Officers and Directors of Elsinore and Debtors." Jeanne Hood testified at the February 9, 1988 confirmation hearing to the accuracy of Appendix C. The Post–Reorganization Salaries of Officers of the Debtors was also supplied to the court as follows:

*ESA*:

| | | |
|---|---|---|
| Jeanne Hood | President | $150,000.00 |
| Richard LeVasseur | V.P. Marketing | $120,000.00 |
| Edward Fasulo | V.P. Operations | $120,000.00 |
| Harry Levin | V.P. General Counsel | $ 90,000.00 |
| R. Bruce McKee | V.P. Finance | $ 92,800.00 |
| Dennis Leong | V.P. Casino Manager | $127,000.00 |

*Elsub, ENJ, EAC, EFC*:

No compensation paid to Officers. (D–18).

Accordingly, the requirements of § 1129(a)(5) are met.

Section 1129(a)(6) requires that "Any governmental regulatory commission with jurisdiction after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in such plan, or such rate change is expressly conditioned on such approval.

Jeanne Hood testified at the February 9, 1988 confirmation hearing that no governmental regulatory commission sets rates for any of the debtors. (*See* Tr. of 2/9/88 at 88). This provision is not inapplicable to the case at bar. The court here notes that

the plan acknowledges as a condition precedent to the closing and consummation of the plan and the transactions contemplated under the plan, the following:

24.1 Gaming Approvals. All regulatory and other approvals required to be obtained in the States of New Jersey or Nevada in order for ESA to be licensed to own and operate the Atlantis as a casino hotel in Atlantic City, New Jersey, in order for the Plan and all transactions contemplated hereunder to be authorized, valid, binding and enforceable without civil or criminal penalty in such States (including, without limitation, the Western Refinancing) shall have been ob-

tained, subject only to conditions which do not impact upon or affect the standards for confirmation set forth in section 1129 of the Bankruptcy Code, and which would not interfere or conflict with observance or performance of the Confirmation Order or other Final Orders of the Bankruptcy Court or the Plan.

On January 25, 1988 the State of New Jersey Casino Control Commission approved that portion of the debtors' plan that involves the proposed distribution of Elsub stock and ESA notes to Playboy subject to nine (9) conditions as follows:

First, Playboy must not have the ability to vote the Elsub stock. The Elsub stock and the ESA notes must be held by a trustee suitable to the Commission.

Second, restriction of the flow of information and communication between Playboy and all Elsinore entities and the trustee.

Third, all Playboy interests must be extinguished within ten years of the bankruptcy court signing an order confirming a plan or reorganization that contains the proposed distributions of stock and notes to Playboy. Whatever proceeds, if any, are derived from the stock sale, up to the maximum described in condition #4, shall be transferred to Playboy, and thereafter its rights in the Elsub stock shall terminate.

Fourth, the aggregate of any payments that Playboy may receive on account of the stock (including dividends), the notes (including any interest thereon), and the Escrow Account as defined in the Plan, shall not exceed the amount of the proofs of claims filed in the bankruptcy court for the note and the accrued management fees.

Fifth, any transfer, by the trustee, of the stock or the notes shall be subject to Commission approval.

Sixth, in the event Elsinore intends to transfer its interest in the Elsub stock prior to Playboy transferring its interest in said stock, provision shall be made to cause the contemporaneous transfer of Playboy's Elsub stock.

Seventh, the trustee shall immediately notify the Commission and the Division of any dividend payments or any payments it receives on the notes or any proceeds of any sale of the Elsub stock.

Eighth, any dividends paid on the Elsub stock shall be transferred to the trustee for distribution to Playboy only after Playboy either qualifies or no longer holds any legal, equitable or beneficial interest in the stock, at which time the trustee may transfer any such dividends to Playboy.

Ninth, the cost of the trusteeship shall be paid in full by Playboy.

(D–14).

Jeanne Hood testified that these conditions are not inconsistent with the plan, and that ESA and its affiliates will be able to met these conditions and go forward with the plan. (*See* Tr. of 2/9/88 at 63).

Section 1129(a)(7) requires that "With respect to of each impaired class of claims or interests [sic]—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or

(B) if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims."

As set forth above, all impaired classes have voted to accept the plan. Subsection (7) focuses upon each holder of a claim, as distinguished from the class in which the claim is placed. Pursuant to clause (A)(i), the standard is satisfied with respect to each holder of a claim or interest which has accepted the plan pursuant to

§ 1126(f). *See In re Toy & Sports Warehouse Inc.*, 37 B.R. 141, 150 (Bankr.S.D.N.Y.1984). The Funds, as holders of unsecured claims have objected to confirmation of the plan and have raised objection to the accuracy of the debtors' liquidation analysis. Although the requisite majority of unsecured claim holders in Class 5A have accepted the plan, such acceptance was not unanimous. As to the dissenting unsecured claim holders, the so-called best interests test, incorporated in § 1129(a)(7) must be met to achieve confirmation. *In re Toy & Sport Warehouse, Inc., supra,* 37 B.R. at 150.

The debtors presented Stephen Cooper to testify regarding the liquidation analysis of the debtors' assets. The liquidation analysis of ESA as of December 31, 1987 stated projected liquidation proceeds of ESA of $139,172,000.00 (D–1 Evd.) and a projected deficit of $33,537,000.00 before distribution to unsecured creditors. (D–7).

Cooper testified that the value assigned to the land, building, improvements, furniture, fixtures and equipment, consisting of all the physical and land assets of ESA was the going concern value established by an October 1986 appraisal by Ackley O. Elmer, the appraiser for the Official Unsecured Creditors' Committee (*See* Tr. of 2/8/88 at 76). Cooper testified that the book value of these assets, depreciated to December 31, 1987 was $121,290.00, and that he was "conservative on the upside" in using the Elmer appraisal. (*See* Tr. of 2/8/88 at 176–77). (D–1). In computing the liquidation analysis allowed secured claims included the mortgage on the Georgia Avenue property in the amount of $6,568,000.00 and the claims of the senior bondholders in the amount of $130,499,-000.00. (D–7). Cooper testified that the Georgia Avenue property was not included as a separate valuation on the basis that Elmer's going concern value incorporated the going concern value of the parking spaces utilized by ESA on the Georgia Avenue property. (*See* Tr. of 2/8/88 at 77–78).

A review of the Elmer appraisal filed with this court on November 21, 1986, and dated November 20, 1986, supports this analysis. Ackley Elmer appraised the Atlantis Casino property at its "highest and best use" as "improved" for a "casino hotel complex" in the sum of $127,000,-000.00. The "Property Synopsis" portion of the written appraisal included under the item "number of parking spaces available" —1,103, which included the Georgia Avenue parking lot. (Appraisal at p. 135). In analyzing the square feet of casino floor per parking space the parking spaces located at the Georgia Avenue parking lot were included. (Appraisal at p. 177).

In analyzing the parking situation the appraisal states:

PARKING:

The Atlantis Casino/Hotel currently has 1,103 parking spaces of which 44 in the Theater Building and 559 at Georgia Avenue are not utilized for patron vehicles. This leaves the 500 +/− parking spaces in Stetson Hall for patron parking. It should be further noted that the available Stetson Hall spaces may vary from day to day depending upon Atlantic City Convention Hall management. The preceding chart shows 45.80 square feet of casino floor per parking space. However, by using the current 500 patron parking spaces would indicate 101.03 square feet of casino floor per parking space. This cuts drastically into the market of patrons who prefer having their own automobiles and leaves the Atlantis very dependent on bus trade and walk-in trade. All the other ten opened, licensed casino/hotels have their own parking garages or are in the process of constructing their own garages.

It is the opinion of your appraiser that lack of patron parking is a major economic problem with the Atlantis Casino/Hotel.

Appraisal at p. 178.

In analyzing the "conclusion of highest and best use" the appraiser consider *inter alia* the following:

In the opinion of your appraiser the major problem with the Atlantis Casino/Hotel complex is the lack of an abundance of parking spaces. Through a lease dated September 16, 1977 between the City

of Atlantic City as Sublessor and the Housing Authority of Atlantic City as Sublessee the Atlantis is to lease approximately 500 parking spaces within the garage area of the West or Stetson Hall of the Atlantic City Convention Hall. The garage floor lease area is approximately 134,000 square feet. Additionally, there is space for approximately 44 automobiles on the roof of the Theater Building which parking spaces are predominantly utilized by the Casino Control Commission and the Division of Gaming Enforcement. In addition to the Convention Hall parking for the Atlantis Casino/Hotel there is off-site surface parking just off the incoming lanes of the Atlantic City Expressway. This surface parking lot can accomodate 559 automobiles. At one time the Atlantis provided shuttle buses for patrons utilizing this parking area. However, this Georgia Avenue parking lot is now utilized for employee parking only which has greatly decreased patron parking facilities. . It is the opinion of your real estate appraiser that the Atlantis Casino/Hotel has insufficient on-site or nearby parking.

Appraisal at p. 215.

The final value conclusion was set forth as follows:

*Final Value Conclusion:*

In the final conclusion valuing the Atlantis Casino/Hotel which is located on both the Northeast and Northwest corners of South Florida Avenue and the Atlantic City Boardwalk in the City of Atlantic City, County of Atlantic, State of New Jersey and which property is also known as lot 157 in block 43 and lots 95, 96, 97 and 177 in block 44 on the tax map of the City of Atlantic City along with the 2,650 square feet of ground covered elevated easements, as of October 1, 1986, in fee simple titlel, values the real estate in use as a "casino hotel complex" for $93,000,000. and the furniture, fixtures and equipment has been taken from the financial statements as of October 1, 1986 of the Atlantis Casino Hotel project which totals $33,814.984. which again your appraiser has rounded to the nearest million dollars or $34,000,000. as

of October 1, 1986. When the value estimate of the real estate in use of $93,000,-000. is added to the value of the furniture, fixtures and equipment of $34,000,-000. the resultant value estimate of the Atlantis Casino Hotel complex, as of October 1, 1986, valuing the property "in use" at its "highest and best use" which is for a "casino hotel complex", subject to the included contingent and limiting conditions, is the sum of:

ONE HUNDRED TWENTY—SEVEN MILLION ($127,000,000.) DOLLARS

Appraisal at p. 226–227.

The Funds argue that the unsecured creditor class would receive more than the amount proposed under the plan if the debtors commenced a marshalling action and subordinated Elsinore's claim. Having already concluded that the record does not support marshalling or equitable subordination, this argument is not sustainable.

The debtors, by their disclosure statement provided:

As noted above, various theories have been asserted by certain creditors seeking to impose liability upon Elsinore including those described under "Legal Proceedings." These theories include equitable subordination, marshalling and fraudulent conveyances. The debtors have investigated the factual and legal bases of these claims and believe they lack merit. In view of the foregoing, the liquidation analysis attributes no value to claims against, or other potential recoveries from, Elsinore.

(*See* Disclosure Statement at p. 58).

The debtors further state in the Disclosure Statement:

On or about November 13, 1984, approximately $7,564,000 in proceeds of the Senior Mortgage Bonds were paid by ESA to EAC and Elsub in partial satisfaction of pre-existing indebtedness. EAC made a partial payment of an existing indebtedness to Elsub on that date. The total of such payments was $7,564,-000. Elsub, in turn, paid approximately $7,564,000 to Elsinore on that date, in partial satisfaction of a pre-existing in-

debtedness. The pre-existing indebtedness arose as a result of the making of mandatory "partner's loans" in accordance with the 1979 partnership agreement between subsidiaries of Playboy and Elsinore. These payments were proper and lawful.

Nevertheless, Playboy has charged that Elsub's payment to Elsinore constitutes an avoidable preference. Elsub and Elsinore contend that no all of the elements of a preference exist and that, in any event, after the date of the transfer, Elsinore gave new value in excess of the amount of the alleged preference which would constitute a complete defense under section 547(c)(4) of the Bankruptcy Code.

The Proponents have not conducted an investigation to determine whether any other transfers are avoidable, and have provided in the Plan that any right to avoid such transfers of property pursuant to any provisions of the Bankruptcy Code or other applicable law shall be deemed waived and released as of the Effective Date.

(Disclosure Statement at p. 57).

Jeanne Hood testified that the debtor placed no value on this alleged preference claim based upon consideration of funds advanced by Elsinore Corporation to or for the benefit of ESA from November 13, 1984 through December 31, 1987, totalling $12,830,000.00. (D–17). (*See* Tr. of 2/9/88 at 76).

This court believes that the valuation of litigation in the context of a Chapter 7 litigation is not suseptible of sufficient certainty. The liquidation analysis of ESA, as of December 31, 1987 projected a deficit of $33,537,000.00 before distribution to unsecured creditors. Thus, even if a Chapter 7 trustee were successful in avoiding the $7,564,000.00 transfer to Elsinore pursuant to § 547(b), unsecured creditors would, nonetheless, receive no distribution in a liquidation.

Stephen Cooper testified that he did not evaluate claims ESA might have against Elsinore. (*See* Tr. of 2/8/88 at 111). Cooper also excluded from the Disclosure Statement any litigation in progress because of its uncertainty. (*See* Tr. of 2/8/88 at 155).

■ This court is satisfied that all the unsecured claimholders will receive under the plan on account of their claims, as of the effective date of the plan "not less than the amount that such holder would so receive or retain if the debtor were liquidated under Ch. 7...." 11 U.S.C. § 1129(a)(7)(A)(ii). Therefore, the best interests test has been met with respect to the unsecured claimholders in Class 5A under the plan.

Section 1129(a)(8) requires that "with respect to each class of claims or interests—

(A) such class has accepted the plan, or

(B) such class is not impaired under the plan."

As set forth above, the plan designates twelve classes of claims and interest. Classes 1 and 3 are not impaired. Under 11 U.S.C. § 1126(c) "a class of claims has accepted a plan if such plan has been accepted by creditors ... that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors ... that have accepted or rejected such plan." Classes 2A, 2B, 4, 5A, 5B, 6, 7, 8, 9 and 10 are impaired and have accepted the plan by the requisite majorities. Accordingly, the requirements of § 1129(a)(8) are met.

Title U.S.C. § 1129(a)(9) requires that:

(9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—

(A) with respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(B) with respect to a class of claims of a kind specified in section 507(a)(3), 507(a)(4), 507(a)(5) or 507(a)(6) of this title, each holder of a claim of such class will receive—

(i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

(C) with respect to a claim of a kind specified in section 507(a)(7) of this title, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

Under § 1129(a)(9)(A) administrative claims and expenses entitled to priority under § 507(a)(1) must be satisfied in cash on the effective date of the plan. Article 3 of the plan provides:

Each holder of an Allowed Administration Expense shall be paid the full amount of such Allowed Administration Expense in cash on the Effective Date, or upon such other terms as may be agreed between such holder and the Debtor liable therefor; provided, however, that Allowed Administration Expenses representing indebtedness or other obligations which are not due and payable until after the Effective Date shall be paid or performed in accordance with the terms and conditions of any agreements relating thereot, and provided further, that Administration Expenses owed to Elsinore (other than any Administration Expenses to be reimbursed pursuant to Article 7 of the Plan) shall be contributed by Elsinore to Elsub, 54.3% of the Administration Expenses owed to Elsub (i.e., those contributed to Elsub) shall be contributed by Elsub to ENJ, and, thereafter, by ENJ to EAC and EAC to ESA and 45.7% of the Administration Expenses owed to Elsub (i.e., those contribured to Elsub) shall be contributed by Elsub directly to ESA.

Under § 1129(a)(9)(B) the holder of claims specified in § 507(a)(3), (4), (5), or (6) are entitled to cash on the effective date equal to the allowed amount of such claim unless the class has voted to accept deferred payment.

Article 6 of the plan provides:

Each allowed priority non-tax claim shall be paid in full in cash on the Effective Date or upon such other terms as may be agreed to in writing by the holder of any such allowed priority non-tax claim.

Under § 1129(a)(9)(C) each holder of a tax claim entitled to priority in accordance with § 507(a)(7) is entitled to receive deferred cash proceeds over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

Article 4 of the plan provides:

Each holder of an Allowed Priority Tax Claim shall be paid the full amount of such Allowed Priority Tax Claim in cash on the Effective Date, or, at the election of the Debtor liable therefor, in equal quarterly installments over a period commencing at the end of the first calendar quarter after the Effective Date, and continuing at the end of each calendar quarter thereafter until the date that is six years after assessment, with interest at a fixed rate per annum equal to the Prime Rate as in effect on the day of Confirmation plus a risk factor component equal to 0.5%, from and after the Effective Date, in the manner set forth in section 1129(a)(9)(C) of the Bankruptcy Code. Notwithstanding the foregoing, each holder of an Allowed Priority Tax Claim may be paid upon such other terms as may be agreed by the holder of such Claim including, without limitation, interest on Allowed Priority Tax Claims for federal income taxes at a rate per annum fixed by the Secretary of the Treasury or the Internal Revenue Service acting under authority of section 6621 of title 26, United States Code. The terms and provisions of any and all such agreements shall be filed with the Bankruptcy Court

prior to Confirmation. Each Debtor will maintain cash or cash equivalents in amounts sufficient to pay all Allowed Priority Tax Claims owed by it when due.

Jeanne Hood testified at the February 9, 1988 confirmation hearing that the debtor had the following administrative and priority claims.

| | |
|---|---:|
| *Undisputed Administrative Claims* | $2,241,759.18 |
| *Disputed Administrative Claims* | 1,007,099.68 |
| *Undisputed Priority Wage and Employee Benefits Claims* | 770,201.85 |
| | (subject to offset for reserves and excess premiums estimated at $500,000.00) |
| *Disputed Priority Wage and Employee Benefits Claims* | 47,500.00 |
| *Miscellaneous Disputed Priority Claims* | 57,747.71 |
| *Undisputed Priority Tax Claims* | 9,312,137.33 |
| *Disputed Priority Tax Claims* | 168,800.93 |

(D–19).

The undisputed claims are subject to payment either on the Effective Date or according to a schedule of payments agreed to by certain holders of these claims. (D–19). Jeanne Hood testified that the debtors had reached an agreement with both the Casino Reinvestment Development Authority and the City of Atlantic City regarding a schedule of payments for those respective claims. (*See* Tr. of 2/9/88 at 96). (D–19).

Jeanne Hood testified that in order to consummate the plan the following payments by ESA on the Effective Date are required:

*Cash Payments by ESA on the Effective Date:*

| | |
|---|---:|
| Assumed Executory Contracts | $ 139,943.00 |
| Maryland National | 35,000.00 |
| Stein's Food Service | 3,994.00 |
| Professionals—estimated | 1,921,000.00 |
| Maria Scavello–Biebel (employee claim) | 1,242.00 |
| Prudential Insurance—net of offset | 233,903.00 |
| Prudential/Southshore (employee claim) | 27,973.00 |
| Unsecured Creditors | 1,000,000.00 |
| | $3,363,055.00 |

(D–20).

Jeanne Hood testified that ESA is required under the plan to keep at least $10,-000,000.00 in working capital at the Atlantis Casino upon consummation of the plan. (*See* Tr. of 2/9/88 at 100).

Jeanne Hood further testified that Elsinore has agreed to lend ESA sufficient funds under a $5 million line of credit to supply sufficient cash on the effective date as follows:

| | |
|---|---:|
| ESA projected cash balance pre-consummation; 3–31–88 | $ 9,438,000.00 |
| Estimated cash payments on effective date | (3,363,000.00) |
| Cash draw on working capital loan from Elsinore Corp. to bring cash balance to $10,000,000.00 in accordance with the plan | 3,925,000.00 |
| ESA projected cash balance post-consummation; 3/31/88 | $10,000,000.00 |

(D–20). (*See* Tr. of 2/8/88 at 100).

The court is satisfied that based upon the foregoing, § 1129(a)(9) has been complied with.

Section 1129(a)(10) requires that "If a class of claims is impaired under the plan,

at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."

As set forth above, Classes 2A, 2B, 4, 5A, 5B, 6, 7, 8, 9 and 10 are impaired and have all accepted the plan by the requisite majorities. Accordingly, the requirements of § 1129(a)(10) are met.

Section 1129(a)(11) requires that "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

Title 11 U.S.C. § 1129(a)(11) requires a feasibility test. It must appear that confirmation of the plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor. In the case of *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653 (Bankr.D.N.J. 1980) the court observed that the following facts should be considered: (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management, and; (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. 7 B.R. at 659. *See also In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 151 (Bankr.S.D.N.Y.1984).

Availability of prospective credit, both capital and trade, adequacy of funds for equipment replacement and provisions for adequate working capital are other factors examined. *See e.g. In re Jartan, Inc.*, 44 B.R. 331, 393 (Bankr.N.D.Ill.1984).

Insofar as it is possible to forecast feasibility, the elimination of debt together with the infusion of funds in light of the market that exists must be considered. *See In re Landau Boat Co.*, 13 B.R. 788, 791 (Bankr.W.D.Mos.1981).

The plan provides for financing to be obtained by the mortgaging of certain properties identified as the casino hotel owned by Hyatt Tahoe located in the north shore of Lake Tahoe at Incline Village, Nevada, and the casino hotel owned by Four Queens located in Las Vegas, Nevada ("Western Properties"). The plan specifically provides:

> On or before the Effective Date, as more fully set forth in the First Interstate Commitment Letter, (a) Four Queens will borrow $40,000,000, to be secured under a first deed of trust and security agreement on certain real and personal property commonly known as the Four Queens Hotel and Casino in Las Vegas, Nevada, (b) Hyatt Tahoe, together with Four Queens as co-maker, will borrow $30,000,000, to be secured under first deeds of trust and security agreements on certain real and personal property commonly known as the Hyatt Lake Tahoe in Incline Village, Nevada, and the Four Queens Hotel and Casino in Las Vegas, Nevada, and (c) Hyatt Tahoe will execute and deliver an additional promissory note in the principal amount of $5,000,000, to be secured by, *inter alia,* the liens and security interests referred to in subparagraphs (a) and (b). Elsinore and its subsidiaries will use the net proceeds to simultaneously make the payments of principal on the Senior Mortgage Bonds required to be made on or prior to the Effective Date in accordance with section 7.1 of the Plan and the payments of principal on the Subordinated Debentures required to be made on or prior to the Effective Date in accordance with section 15.2 of the Plan.

Article 2.1 of the Plan.

Jeanne Hood testified at the February 9, 1988 confirmation hearing that Elsinore had received a commitment letter dated June 15, 1987 from First Interstate Bank of Nevada N.A. ("First Interstate Bank") setting forth the terms and conditions under which First Interstate Bank would loan to Four Queens, Inc. and Hyatt Tahoe, Inc. up to $75,000,000.00. (*See* Tr. of 2/9/88 at 35). (D–12).

The commitment letter, dated June 15, 1987 provides in pertinent part:

## 1. *Loan Type and Collateral*

The loan shall be comprised of three notes hereinafter referred to as Notes "A", "B", and "C" as follows:

*Note A* shall be in the principal amount of $40,000,000 and shall be evidenced by a Promissory Note executed by Four Queens, Inc. as Borrower. Note A shall be secured by First Deed of Trust and Security Agreement on the real and personal property known as the Four Queens Hotel and Casino ("Deed of Trust A"). Deed of Trust A shall encumber the fee and leasehold interest in the real property to include the parking garage, together with all furniture, fixtures, and equipment.

*Note B* shall be in principal amount of $30,000,000 and shall be evidenced by a Promissory Note executed by Hyatt Tahoe, Inc. Note B shall be secured by a First Deed of Trust and Security Agreement on the real and personal property known as the Hyatt Lake Tahoe ("Deed of Trust B") and Deed of Trust A.

*Note C* shall be executed by Hyatt Tahoe, Inc. to evidence the indebtedness which will become due and owing Bank upon the funding of the Hyatt Letter of Credit, as hereinafter defined, which Note C shall be in the principal amount of $5,000,000 and shall be secured by Deed of Trust A and Deed of Trust B.

Borrowers agree to remit the sum of $2,500,000 by the end of the second loan year and thereafter shall remit annually to Bank the additional sum of $1,250,000 as additional security for Note C until the sum of all such remittances totals $5,000,000. Bank shall place each remittance in a Certificate of Deposit which shall be pledged to Bank as additional security for Note C (the "Letter of Credit Fund").

Notes A, B, and C shall be further secured by such additional security instruments and assignments deemed necessary by Bank's counsel. (The rents and revenues due, and to become due to Hyatt Tahoe, Inc., as owner under the terms of the Hyatt Management Agreement, shall be assigned to Bank as additional security for Notes A and B.)

## 2. *Participation Requirements*

Bank's commitment to lend hereunder is subject to Bank receiving participation commitments in a form and from lenders acceptable to Bank in the aggregate amount of $55,000,000.

## 3. *Purpose*

The proceeds from Notes A and B shall be utilized to retire the $25,000,000 principal balance of the Elsinore Corporation, 14.0% subordinated debentures, to reduce by $20,000,000 the 15.5% senior mortgage bonds which are secured by the Atlantis Casino Hotel, and to retire the principal balance of the $25,000,000 senior mortgage bonds which are secured by the Hyatt Lake Tahoe Hotel Casino.

A Letter of Credit ("Hyatt Letter of Credit") shall be issued by Bank in favor of Hyatt Corporation and shall be payable in accordance with the terms and conditions of a tri-party agreement between Hyatt Corporation, Hyatt Tahoe, Inc., and Bank. The agreement shall set forth the terms under which Hyatt Corporation shall subordinate to Deed of Trust B, the Management Agreement dated March 30, 1979, between Hyatt Tahoe Management Corporation and Hyatt Tahoe, Inc. Note C shall evidence the indebtedness owing Bank upon the funding of the Hyatt Letter of Credit after crediting against such indebtedness the amount of the Letter of Credit Fund.

## 4. *Guarantors*

Note A shall be guaranteed by Hyatt Tahoe, Inc. and Elsinore Corporation. Note B shall be guaranteed by Four Queens, Inc. and Elsinore Corporation. Note C shall be guaranteed by Four Queens, Inc. and Elsinore Corporation.

The obligation of First Interstate Bank to disburse any funds is subject to numerous conditions, including the following:

(4) During the life of the Commitment and Loan, Borrowers and/or Elsinore Corporation shall not make any loans, advances, or equity contributions to any affiliate, except for advances made in conjunction with this loan closing as approved by Bank. Nothing herein shall

prevent Borrowers from advancing funds to Elsinore Corporation to satisfy Elsinore Head Office expense. Borrowers and/or Elsinore Corporation shall be allowed to loan a maximum of $5,000,000 to the Atlantis Casino Hotel pursuant to a condition of the Atlantis Gaming License. (D–12).

Jeanne Hood testified that a syndicate of participating banks have been assembled and participation commitments obtained in the amount of $55,000,000. (*See* Tr. of 2/9/88 at 37). Jeanne Hood also testified that Elsinore Corporation, Hyatt Tahoe, Inc. and Four Queens intend to take the appropriate corporate action to guarantee the note obligations in accordance with the commitment letter. (*See* Tr. of 2/9/88 t 38). Jeanne Hood further testified that the terms and conditions of the commitment letter have been met and the commitment which by its terms expired on December 31, 1987 unless extended by the Bank, in writing, has been extended by the Bank to April 30, 1988. (*See* Tr. of 2/9/88 at 38–51). (D–13).

In the instant case, feasibility also depends upon the debtors' ability to increase revenues while maintaining the cost-cutting it has instituted over the course of these proceedings. The operations of the first post-confirmation year, while producing a book loss, should also produce a positive cash flow to allow operations to continue. The continuation of the debtors' management under the direction of its president, Jeanne Hood, assures an uninterrupted management policy in the post-confirmation period.

The Objectors, Funds, presented the testimony of Al Glasgow, who is engaged as a consultant in the gaming industry. Glasgow testified that from historical revenue data the gaming revenues of Atlantis for 1987 were 29% lower than 1986. (*See* Tr. of 2/18/88 at 116). (O–6). Based on the same historical revenue figures the casino revenues as reflected by "total win", "total drop", "table win", "slot win", "slot handle" showed decreases for the period September 1987 through January 1988 as compared to the period September 1986 to January 1987. (O–7).[1] Glasgow attributed this decrease to the strike period at the Atlantis and "an acceleration of an already existing loss." (*See* Tr. of 2/18/88 at 123). Glasgow further opined that low-limit games would not support a loyal customer base to allow the casino to make money (*See* Tr. of 2/18/88 at 151); that a proposed "token" program at the Atlantis was an "excellent idea" (*See* Tr. of 2/18/88 at 154); but that its ability to increase revenues depends upon the number of people bussed to the casino and the areas from which they are bussed. (*See* Tr. of 2/18/88 at 159). Glasgow also testified that the debtors' projections of casino revenues, specifically $85,000,000.00 for 1988 was not "realistic" in view of an $11,000,000.00 increase in casino revenues with a concomitant $3,000,000.00 increase in expenses. (*See* Tr. of 2/18/88 at 161–163). Glasgow based this conclusion in part on two findings that the Atlantis in January 1988 had a total win decrease of 13.8% over January 1987. "Total win" is the amount of money won by the casino by its games and slots. (*See* Tr. of 2/18/88 at 135). Glasgow predicted an increase in gaming revenues for the Atlantis of $3,000,000.00 for 1988. (*See* Tr. of 2/18/88 at 165). Glasgow testified that for the next year the Atlantis would suffer continued losses from the casino operations, (*See* Tr. of 2/18/88 at 169) and that "if the same patterns of operations continue," the "Atlantis can't make it" (*See* Tr. of 2/18/88 at 174), "unless there's a dramatic turn-around in gaming revenues that are realistically put into the plan" that being a

**1.** At the confirmation hearing Glasgow explained some of the relevant terms as follows. "Table drop" represents sales, or the amount of money purchased by a patron in cash or markers in exchange for chips. (*See* Tr. of 2/18/88 at 75). "Table win" is the amount of money that the casino retains based upon a hold percentage from its customers. (*See* Tr. of 2/18/88 at 75). "Slot handle" is coinage that goes into the coin acceptor of the slot machine. (*See* Tr. of 2/18/88 at 75). "Slot win" is the gross revenue from slot machines before the casino's expenses are deducted. (*See* Tr. of 2/18/88 at 76). "Total win" is the amount of money won by games and slots. (*See* Tr. of 2/18/88 at 135).

long-range marketing plan." (*See* Tr. of 2/18/88 at 176).

In assessing Mr. Glasgow's testimony this court considers the fact that Glasgow examined no marketing plan of the Atlantis, and was unaware of what it consisted of. (*See* Tr. of 2/18/88 at 178). Glasgow neither conducted nor examined any studies of low-limit games at the Atlantis, no study of repeat customers to the Atlantis, any internal operating reports, departmental analysis or bus information since August 1987. (*See* Tr. of 2/18/88 at 213–216). Glasgow's "prediction" of a $3 million increase in gaming revenues was not based on any calculations (*See* Tr. of 2/18/88 at 185); Glasgow undertook no analysis of complementaries (*See* Tr. of 2/18/88 at 188); the Atlantis casino performance statistics utilized by Glasgow (O–5) did not take into account the number of table games operating for the relevant periods, but only the numer of authorized table games. (*See* Tr. of 2/18/88 at 201–203).

Except for the historical data presented by Glasgow on reported gaming revenues, his testimony and the conclusions derived therefrom are devoid of any analysis of operations at the Atlantis to represent a reliable indicator of performance. At best, Mr. Glasgow's testimony represents an unreliable "prediction" that cannot displace the extensive analysis conducted by the debtors on their projections of future operations. Accordingly, the requirements of § 1129(a)(11) are met.

Section 1129(a)(12) requires that "all fees payable under section 1930, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan."

Jeanne Hood testified that the debtor was current with respect to all required fees. (*See* Tr. of 2/9/88 at 106).

Based upon the foregoing, confirmation of the Third Amended Plan of Reorganization shall be and the same is hereby denied.

An order shall be submitted in accordance with this decision.